In re HOFFINGER INDUSTRIES, INC., Debtor.

Leesa Bunch and McMasker Enterprises, Inc., Plaintiffs,

v.

J.M. Capital Finance, Ltd. and Arrowhead Insurance Co., Defendants.

Bankruptcy No. 2:01bk20514.
Adversary No. 2:04–ap–1302.

United States Bankruptcy Court, E.D. Arkansas, Helena Division.

July 12, 2005.

Stephen L. Gershner, Little Rock, AR, Matthew D. Wells, for Defendants.

James E. Smith, Whitney Davis, for Plaintiffs.

Stan Smith, Little Rock, AR, for the debtor.

Charles Tucker, Assistant U.S. Trustee.

## MEMORANDUM OPINION AND ORDER

RICHARD TAYLOR, Bankruptcy Judge.

The debtor, Hoffinger Industries, Inc., manufactures aboveground swimming pools and accessories. Its principal manufacturing plant is located in West Helena, Arkansas, and it has facilities in Rancho Cucamonga, California, and offices in Mississippi. The debtor filed its chapter 11 petition on September 13, 2001, in reaction to a personal injury judgment of approximately $13,500,000 in favor of Leesa Bunch [Bunch] rendered August 23, 2001, in Glenn County Superior Court, California.[1] Bunch suffered her injuries in August 1993. The initial notice of litigation to the debtor and the retailer involved occurred in November 1998. (Pls.' Ex. 48B.)

This Court denied confirmation of the debtor's proposed plan of reorganization in its Opinion dated February 24, 2005, and subsequent Judgment and Order dated March 3, 2005. Throughout this bankruptcy proceeding, the debtor has consistently refused to acknowledge that it has lost the Bunch litigation, both at the trial court and appellate levels. In the plan, Bunch's claim was simply not addressed as required by the code.

In conjunction with objecting to the debtor's plan, Bunch initiated this adversary proceeding questioning the claims filed by J.M. Capital Finance, LTD [JM Capital] and Arrowhead Insurance Co. [Arrowhead]. Bunch asserts that these two claims should be disallowed, reconsidered under 11 U.S.C. § 502(j), equitably subordinated under § 510, or reclassified. In addition to contesting Bunch's assertions, Arrowhead filed its request to have post-petition product liability insurance premiums due from the debtor treated as an administrative claim. By agreement of the parties, the adversary complaint and the administrative claim application were tried together the week of May 2, 2005. The debtor appeared and participated through its counsel and president.

For the reasons stated below, the Court disallows and recharacterizes/reclassifies the JM Capital claim as equity. Also, in the event that it is determined that JM Capital has a claim, the claim is subordinated to the claims of all other creditors of this debtor under the principles of equitable subordination. The administrative application filed by Arrowhead is granted in part, and denied in part.

### JURISDICTION

This Court has jurisdiction over this matter under 28 U.S.C. § 1334 and 28 U.S.C. § 157, and it is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (K), and (O). The following opinion constitutes findings of fact and conclusions of law in

---

1. Approximately $1,000,000 of this amount relates to the retailer's claim against the debtor.

accordance with Federal Rule of Bankruptcy Procedure 7052.

## MARTIN HOFFINGER AND THE HOFFINGER FAMILY

Martin Hoffinger, married to Lorraine Hoffinger, is the founder of the entity now known as the debtor and is the patriarch of the Hoffinger family. He acquired his initial interest in the debtor in 1945. It, and the other entities discussed below, have always been closely held by members of the immediate Hoffinger family, their spouses, and children. (Defs.' Exs. 18, 19, and 20.) Although Martin Hoffinger has divested his ownership interest in the debtor over the years, he has been and remains a director and its CEO. Martin Hoffinger and his family are integral to the transactions described below.

## THE CLINTON POOL TRANSACTION

In her adversary proceeding, Bunch comprehensively attacks JM Capital's approximately $10,000,000 secured claim. The basis of JM Capital's claim is a purported loan that occurred in 1999 which, as explained below, also involved Arrowhead, the debtor's product liability insurance carrier. The JM Capital transaction in 1999 can only be understood in its historical context. This requires an understanding of a 1993 $8,250,000 loan to the debtor from Clinton Pool Company, Inc. [CPC].

CPC is owned by eleven Hoffinger family members, either immediate or through marriage, including Ellen Lowe and Candace Caplin, two of Martin and Lorraine Hoffinger's daughters. (Defs.' Ex. 54.) CPC is a Nevada corporation that was incorporated on December 9, 1992. Ellen Lowe is the president and Candace Caplin is the treasurer. (Defs.' Ex. 71.) It maintains an account with check writing privileges through Salomon Smith Barney.

(Defs.' Ex. 19.) CPC elected to become a subchapter S corporation on November 3, 1993. Its address for IRS purposes is in care of Candace Caplin in North Stamford, Connecticut. (Defs.' Ex. 54.) CPC does not have offices, other than Ms. Caplin's home address, and does not appear to conduct any active business activities other than the loan discussed below. Lorraine Hoffinger is the only shareholder of the debtor who is not a CPC shareholder; all CPC shareholders are shareholders of the debtor.[2] (Defs.' Ex. 18 and 19.)

The debtor borrowed $8,250,000 from CPC in fall 1993. The debtor's board of directors authorized the CPC transaction in a meeting held August 25, 1993. Martin and Lorraine Hoffinger were the only members of the debtor's board of directors at that time. The appropriate resolution reflected that an $8,250,000 loan would be "offered" to the debtor from CPC. The terms were annual interest payments with the principal to mature on October 1, 2003. (Defs.' Ex. 15.) In other words, this was a ten year note with no reductions in principal. CPC's board of directors approved the loan to the debtor at a board meeting held August 27, 1993. Candace Caplin and Ellen Lowe, both daughters of Martin and Lorriane Hoffinger, were CPC's only two directors. (Pls.' Ex. 18.)

By subsequent resolution in October 1993, the debtor's board authorized the debtor to pay the accrued interest due CPC. (Defs.' Ex. 15, Certificate of Passage of Resolution at the Special Meeting of the Board of Directors of Hoffinger Industries, Inc. Held on October 1, 1993.) The notice waiver recites the purpose of the special meeting: "To consider and pass upon the ratification and confirmation of the terms of *interest* payments of loans payable which are due to *shareholders* by

---

**2.** The record is unclear if Elise Newman is the same person as Elise Lowe. Elise Newman is a shareholder of the debtor; Elise Lowe is a shareholder of CPC.

Hoffinger Industries, Inc." Defs.' Ex. 15, Waiver of Notice of Spec. Meeting of the Bd. of Dirs. of Hoffinger Indus., Inc., held on October 1, 1993 (emphasis added). In fact, CPC was the lender, not the debtor's shareholders. CPC has never been a shareholder of the debtor. As discussed below, CPC did not actually fund the loan until November 1993, if at all. Thus, the above corporate book entry is significant in two respects. First, the debtor treated this transaction as being effective as of a date earlier than its actual funding. Second, it recognizes the real purpose of the CPC transaction was not to incur typical business debt, or even to incur debt to distribute shareholder earnings, but to effectuate a method for paying shareholders interest on their accumulated equity.

The ostensive purpose of the CPC loan was to enable the debtor to make a distribution from the debtor's AAA account representing shareholder equity. It is not unusual for closely held corporations to borrow money to fund distributions for subchapter S purposes, be they tax related or to distribute earnings. However, as will be set forth below, CPC funded the entire loan from the concomitant shareholder's distribution. In other words, the debtor used CPC, an otherwise inactive corporation controlled by Hoffinger family members, to allow the shareholder distribution to fund the distribution to shareholders. This circle invites further scrutiny.

Martin Hoffinger testified that in 1993 the debtor's shareholders, his family, were demanding a distribution of their accumulate equity. On receipt of their $8,250,000 distribution, they loaned the full amount to CPC, which in turned loaned the money to the debtor to make the distribution. No documents were introduced supporting this loan from the debtor's shareholders to CPC. No loan agreements, promissory notes, bank statements, shareholder agreements, cancelled checks, or other supporting documents appear to exist purporting to show how, and in what proportions, the $8,250,000 was distributed to the debtor's shareholders, or how it was in turn transferred or loaned to CPC.

Nor could Mr. Hoffinger explain why the debtor immediately borrowed back (to make the distribution) the $8,250,000 distribution utilizing CPC, other than to state that the end purpose of the transaction was to pay interest to shareholders on their equity in the debtor. The debtor's CFO could find no record of the debtor ever, in 1993 or at any other time, actually distributing the $8,250,000 to the shareholders other than the AAA account being reduced by that amount.[3] This issue bears examination because, as explained below, at some point CPC funded the loan with a check to the debtor. However, the sole source of that funding to CPC through its bank account was, according to witness testimony on behalf of the debtor and JM Capital, the debtor's distribution to its shareholders. During the trial Martin Hoffinger agreed with a statement Ellen Lowe, his daughter, made earlier that the approximate $8,250,000 deposited into CPC's account came from a check drawn on an account belonging to the debtor.

However, no evidence of a real money transfer exists. While "real" money is not necessary to counterbalancing book en-

---

**3.** The debtor had made yearly distributions to cover shareholder tax obligations on accrued but undistributed earnings. The $8,250,000 amount was not for tax purposes. Martin Hoffinger thought the debtor might have had enough cash in 1993 to make the distribution.

If so, that fails to explain why the debtor needed to borrow the $8,250,000 right back. Further, the debtor's current CFO could not find any evidence of that amount being distributed from the debtor's coffers.

tries, it is when a bank account, with commensurate deposits and withdrawals, is used to effect the transaction.[4] The debtor's CFO postulated (but offered no proof, and stated he could not find any record of a distribution) that the debtor had enough cash to make the distribution; Martin Hoffinger alternatively suggested a short term bank loan might have been involved.[5] In either case, no supporting records or documents could be produced, which should have been relatively simple. Plus, both scenarios leave unanswered the question of why the debtor would fund its own borrowing. Both the debtor's CFO and Martin Hoffinger acknowledged that the real purpose was to pay interest on equity. Martin Hoffinger, in response to the Court's questions regarding why the shareholders would lend the money back to the debtor through CPC, stated, "[w]hile it was in the AAA account it was not bearing interest and this way, if they were going to keep their money in there, they were getting interest on it and they did that through CPC." Part. Tr. Transcr., Test. of Martin Hoffinger vol. 2, 138:22–25 (May 4, 2005).

Michael French, the debtor's outside auditor, testified regarding the original CPC transaction as follows:

> The impact was somewhat significant for shareholders. They now had an eight point two five million loan to the company earning interest and getting paid currently every year the interest element on a loan. So while it was in the subchapter S earnings category it was— they weren't getting paid anything; while it was in the loan category, there

were getting paid annually some, I don't know, whatever their interest rate is times the balance, probably some six hundred, seven hundred thousand dollars a year.

Part. Tr. Transcr., Test. of Michael French vol. 1, 26:4–12 (May 5, 2005).

The CPC loan was booked on the debtor's fiscal year end balance sheet dated June 30, 1993. This balance sheet reflected a remaining stockholders' equity of $10,172,501. Originally, the distribution of subchapter S earnings was to be supported by a note payable to the stockholders, but subsequent to year-end, the debtor signed a note payable to CPC. When the distribution and loan were booked effective June 30, 1993,[6] the debtor was being sued for $10,000,000 related to a personal injury suit, sometimes referred to as the Fleck II case. On August 27, 1993, after the 1993 fiscal year end, a Federal District Court entered summary judgment in favor of the debtor. (Defs.' Ex. 27.)

The Promissory Note to CPC is dated October 1, 1993, well after the loan was booked as of June 30, 1993, and interest started to accrue. (*See* Defs.' Ex. 15, authorizing on October 1, 1993, payment of interest already accrued.) It is an interest only note payable annually on October 1, commencing October 1994 and maturing on October 1, 2003. Martin Hoffinger executed the note on behalf of the debtor. The interest rate is tied to "the published prime rate . . . ." Defs.' Ex. 30. CPC took as collateral real (Defs.' Ex. 31; Pls.' Ex. 25) and personal property (Pls.' Ex. 24)

---

4. The facts suggest that CPC's check may have been used to fund the deposit back into its account through another account and a corresponding inter-bank entry. No direct evidence to this effect was produced, but the inference remains given the lack of documentation.

5. Even if a short term loan was involved, there would have to be records and, at least, entries on the debtor's books reflecting the loan and the subsequent distribution to shareholders.

6. The distribution was for subchapter S earnings as of June 30, 1992. (Pls.' Ex. 30 n. 5.)

constituting most, if not all, of the debtor's assets.[7]

The principle reason for all of this was to pay interest to stockholders on accumulated earnings. A secondary effect was to collateralize this relationship and thus create a preferred secured creditor on debt that moments before had been stockholder equity. This effectively rendered the debtor judgment-proof from collection efforts by any unrelated third party, an expectation the debtor had given the status of the Fleck II litigation, which was still extant at the June 1993 fiscal year end effective date. No real distribution occurred. The distribution funded the loan; the loan funded the distribution.

The original $8,250,000 loan was funded by CPC signing a counter check dated November 3, 1993. (Defs.' Ex. 37.) No witness, including Martin Hoffinger, could explain how CPC obtained $8,250,000 to fund this check. The circular testimony was that the loan was for the purpose of distributing shareholder earnings of $8,250,000. The assertion was the debtor did not have that amount in cash and accordingly had to borrow from CPC. However, CPC, as previously discussed, was owned exclusively by shareholders of the debtor. Further, CPC apparently did not conduct any business or have any assets; basically, its sole purpose was to loan money to the debtor. No one, including Martin Hoffinger who was intimately involved in the transaction, could clarify how CPC obtained money from its shareholders to loan to the debtor when the debtor's loan was the source of the distribution to the shareholders, which they in turn used to fund the loan to CPC. The contention that this was merely a paper transaction falls apart when a bank is involved and a counter check drawn on that bank was

issued in the amount of $8,250,000. Corporate entities can do paper entries. Banks, in the absence of real money in a real account, cannot. No one could explain how CPC obtained the $8,250,000 to loan to the debtor. In fact, the check from CPC to the debtor is dated November 3, 1993; the deposit to cover it was not made until November 5, 1993. The only testimony regarding the source of the deposit is that it somehow came from the debtor.

Thereafter, the debtor paid CPC interest on the loan with no reductions of principal until the JM Capital transaction in August 1999. In 1995, the debtor paid $497,438 on accrued interest due and owing to CPC in the amount of $686,780. (Defs.' Ex. 27, Fin. State, July 31, 1995, n. 6.) It is difficult to quantify exactly the interest amounts paid in 1993 and subsequent years because the CPC note and other related party obligations are not always differentiated in the audited financial statements. The July 31, 1997 and 1998, Financial Statement reflects interest payments to CPC of $808,791 and $741,904. The debtor's auditor suggested the interest payments were approximately six to seven hundred thousand dollars a year. On at least one occasion, the debtor rolled over interest into principle and paid additional interest. (Defs.' Ex. 39: $580,900 in July 1995.)

JM Capital's $10,000,000 proof of claim directly relates to the original CPC transaction. In the debtor's audited July 31, 2000 and 1999, Financial Statement, the CPC $8,250,000 1999 line item debit disappears and reemerges as the $10,000,000 JM Capital year 2000 line item. Ostensibly, the JM Capital loan paid off CPC and permitted an additional $1,750,000 distribution to the debtor's shareholders. The

---

**7.** This and the JM Capital debt discussed below were at all times subordinated to the debtor's principle line of credit and industrial revenue bond lenders.

circumstances of this transaction will be discussed in more detail below. The debtor paid $742,500 in interest in 1999 and $878,400 in 2000. (Defs.' Ex. 27, Fin. State. July 31, 2000 and 1999.) No explanation is given as to why the JM Capital transaction occurred in 1999, other than that the CPC loan was then coming due. This assertion is patently incorrect given the October 2003 CPC maturity date.

When this change occurred in 1999, no original CPC note marked "paid" was ever requested, provided, or documented. It appears that some or all of CPC's collateral filings or recordings were never released. The auditors for the debtor simply accepted a written confirmation of the zero balance from Ellen Lowe on behalf of CPC. The confirmation letter originated from Jennifer Dunn, the debtor's CFO at that time, and was countersigned by Ellen Lowe. As mentioned above, Ms. Lowe is one of Martin and Lorraine Hoffinger's daughters. The auditor's confirmation letter confirming the new JM Capital debt was from Ms. Dunn to Peter Caplin, Ms. Lowe's brother-in-law.

ARROWHEAD INSURANCE COMPANY

Prior to examining in detail the transition of the CPC credit to JM Capital, it is necessary to understand the role that Arrowhead, the debtor's product liability insurer, played with respect to the debtor. The issue of Arrowhead's administrative claim will be examined in another section of this opinion.

Martin Hoffinger testified that the debtor has always needed product liability insurance. In addition to the protection it affords the debtor, both the debtor's lenders and its retailers expected the debtor to carry an adequate policy. Mr. Hoffinger explained that the debtor experienced difficulty in obtaining coverage in the 1980s because of pool industry litigation losses. By 1987, the debtor was unprotected.

Initially, the debtor self-insured using an entity it created—Products Quality Assurance Group, Inc. [PQA]. The debtor contracted with PQA to manage its product liability cases for a fee equal to 5% of net sales. (Pls.' Ex. 17.) The fee covered management and indemnification to the debtor for all costs incurred with respect to any claim over $50,000, up to $500,000 a claim, not to exceed $3,000,000 per annum. (Defs.' Ex. 15.) It appears in late 1992 or early 1993, PQA took the unusual step of pledging its assets to collateralize industrial revenue bonds benefitting the debtor. (Defs.' Ex. 15, Consent of the Dirs. of the Bd. of Dirs. of Hoffinger Indus., Inc. dated Dec. 21, 1992.) PQA was formed by the debtor and served in an administrative role and not as an independent insurer.

For significant periods of time since October 1987, and as of June 30, 1993, the debtor had elected not to purchase liability insurance. (Defs.' Ex. 27, Fin. State. June 30, 1993, n. 7.) According to the debtor's auditors, in 1993 the debtor's managers evaluated the cost benefits of purchasing such insurance. A year later, in June 1994, Arrowhead was formed as a Cayman Islands entity (Pls.' Ex. 33) and the debtor paid premiums for fiscal year 1994 in the amount of $1,496,000 (Defs.' Ex. 27, Fin. State. June 30, 1994, n. 9). The initial directors were The Director Ltd. (resigned approximately one month after appointment), Martin Hoffinger (also Chairman), and Ellen Hoffinger Lowe.[8] Ms. Lowe served as its secretary, with Terry Burke serving as its assistant secretary and noted as an "Insurance Manager/Accountant." Mr. Burke became a director in 2003, at the same time Ms. Lowe

8. Ms. Lowe resigned in July 2003. (Pls.' Ex. 43.)

resigned her position. A Cayman Islands entity managed Arrowhead. (Defs.' Ex. 16.) Arrowhead's sole customer and source of income was the debtor, and it conducted no other business activities, insurance or otherwise.

Arrowhead is owned by Chief Enterprises, Ltd. [Chief], an entity owned in five equal parts by Hoffinger family members, including Lorraine Hoffinger, Candace Caplin, and Ellen Lowe. (Defs.' Ex. 20.) All five shareholders are shareholders of the debtor. (Defs.' Ex. 18.) Arrowhead, in turn, wholly owns JM Capital. Arrowhead in many ways acts similar to PQA. The policy was an indemnity policy that reimbursed the debtor for its fees, costs, and expenses, as well as any judgment amount, up to $500,000 per claim after a $50,000 deductible. Other than Mr. Burke acting as an insurance manager/accountant, it had no employees. The indemnity amount did not inure to the benefit of injured third parties. In referring to fifteen pending personal injury lawsuits, the debtor stated, "[w]e control our own litigation." Defs.' Ex. 15, Mins. of Bd. Meeting of Hoffinger Indus., Inc., May 21, 1996 at the Holiday Crown Inn in New York City. In addition to its role as the debtor's insurance company, Arrowhead also played a part in the 1999 JM Capital, CPC, and debtor transaction.

## THE JM CAPITAL TRANSACTION

In 1999, the debtor incurred $10,000,000 in debt to JM Capital. This transaction forms the basis for JM Capital's secured claim filed in this bankruptcy proceeding. The debtor has never questioned the validity of this debt, and the debtor's proposed plan of reorganization contemplated paying JM Capital in full, including principle and interest.

By a Loan Agreement dated August 4, 1999, the debtor borrowed $10,000,000 from JM Capital. (Defs.' Ex. 33.) It is JM Capital's and the debtor's contention that the proceeds were used to pay the $8,250,000 debt to CPC, with the $1,750,000 balance distributed as equity to the debtor's shareholders. (Defs.' Ex. 36.) Several pertinent facts emerge from the August 4, 1999, Loan Agreement. The interest rate is not stated on the agreement. The agreement calls for the transfer of $5,000,000 in cash directly to the debtor. Simultaneously with that transfer, JM Capital was to execute five $1,000,000 notes in favor of the debtor.[9] The first note was to have a maturity date of October 1, 2000, with the remaining notes to mature on October 1, 2001, 2002, 2003, and 2004. Finally, the agreement acknowledges that part of the proceeds are to be used to pay CPC. This would involve the debtor paying cash and securities to CPC and assigning to CPC the five $1,000,000 promissory notes.

With one exception, there is no credible evidence that the five $1,000,000 promissory notes were ever drafted, executed, or assigned. At trial, JM Capital suggested that there did not need to be an assignment as the note relationship could have been directly between JM Capital and CPC. In the first instance, no evidence was presented that this alternative scenario ever occurred. Second, that scenario is inconsistent with the actual wording of the JM Capital/debtor Loan Agreement. Third, in her memo of June 2, 1999, Jennifer Dunn characterized the transaction as one involving an assignment of five $1,000,000 "notes receivable from J.M. Capital Finance ...." Pls.' Ex. 55. Fourth, Martin Hoffinger's memo of June 18, 1999, (Pls.' Ex. 57) also characterized

---

**9.** JM Capital's books reflect five $1,000,000 notes, each dated August 2, 1999, with matu-rity dates starting October 1, 2000, to October 1, 2004. (Defs.' Exs. 17 and 32.)

the five $1,000,000 notes as "negotiable," which would be transferred from the debtor to CPC. Fifth, unaudited JM Capital financial statements refer to the notes as having been "issued," (Pls.' Ex. 75) but again no evidence was presented reflecting their actual existence. Further, the sole $1,000,000 note in existence (Pls.' Ex. 91) has JM Capital as the maker and the debtor as lender/payee. This sole promissory note, dated August 2, 1999, has a prime rate tied to Citibank of New York. No one produced a copy or an original of the other four notes, nor could any witness unequivocally and credibly state that they had ever seen or handled the other four notes. The Court finds that these notes simply do not exist.

The Loan Agreement calls for mortgages on property located in California and Arkansas, as well as financing statements on all the debtor's personal property. It does not appear that the mortgages were properly recorded. Additionally, as reflected in the debtor's cash collateral motion, the validity of JM Capital's UCC financing statements are questionable. The liens purport to be a blanket lien on all the debtor's personalty.

The debtor also executed a $10,000,000 Promissory Note on August 4, 1999, to JM Capital. It is an interest only note, payable annually on October 1, commencing October 1, 1999, with the entire unpaid principal balance plus accrued interest due and payable on August 4, 2009. It is a ten year note carrying no reductions in principal until maturity. Interest is tied to the "published prime rate." Defs.' Ex. 32. The attendant Loan Agreement with JM Capital does not clarify the interest rate. "Prime Rate" is meant to be a defined term correlated to a published bank rate, but the specific bank designation is blank. (Defs.' Ex. 33.) The sole existing one mil-lion dollar note does refer to Citibank of New York.

The JM Capital money to make this loan came from Arrowhead. Specifically, Arrowhead held a board meeting to consider this matter on July 20, 1999. JM Capital was a wholly-owned subsidiary of Arrowhead formed in the Cayman Islands on either July 20, 1999, (Defs.' Ex. 17) or July 14, 1999, (Defs.' Ex. 62). JM Capital's principle activity was to provide financing to the debtor. (Defs.' Ex. 62, Arrowhead Ins. Co. Consolidated Fin. State. June 20, 2001 and 2000, n. 1.) In fact, no evidence exists that it had any other purpose or ever engaged in any other business activity. Arrowhead capitalized JM Capital in the amount of $50,000. Also, Arrowhead authorized the transfer of $5,000,000 in cash investments held at the Bank of Bermuda to the debtor's account at Salomon Smith Barney to occur on or about August 2, 1999. According to the debtor's documents, JM Capital was to purchase $10,000,000 of the debtor's notes payable (actually only $8,250,000 as a note payable to CPC, plus $1,750,000 as a distribution to shareholders) by the payment of $5,000,000 in cash and five notes payable of $1,000,000 each. (Defs.' Ex. 16; Pls.' Ex. 38.) Arrowhead did not take a note back from JM Capital. Adequate documentation explaining or quantifying the relationship between JM Capital and Arrowhead does not exit. The two entities do prepare consolidated financial statements.

Arrowhead was JM Capital's sole source of financing. The debtor was Arrowhead's only customer and was its sole source of income. This was recognized by Mr. Hoffinger, on behalf of the debtor, who explained to Arrowhead's Cayman Islands manager, Ron Sulisz, that "[t]he annual payment of the balance of the purchase of the notes will be less than the amount received annually from premiums. There-

by allowing Arrowhead to continue to grow its equity." Defs.' Ex. 36, letter dated May 11, 1999, from Martin Hoffinger to Ron Sulisz. According to a post-petition auditor report, from June 1988 through July 2002 the debtor had paid Arrowhead premiums of approximately $20,000,000.[10] (Defs.' Ex. 58.) Despite this large financial outlay, no one on behalf of the debtor had ever compared premiums paid to indemnity claims made and received.

Martin Hoffinger, a director of both the debtor and Arrowhead,[11] apparently concluded that Arrowhead could afford this investment of its premium income. Mr. Hoffinger suggested this transaction would increase Arrowhead's yield via its wholly-owned subsidiary by 40%. Further, Mr. Hoffinger stated:

> The costs to Arrowhead for claims paid, from the inception of Arrowhead, has been minimal. We do not expect claims of any substance to originate in the immediate foreseeable future. There are only three claims now open. All three are expected to be settled under the self insurance reserve of the insured.

Defs.' Ex. 36, letter dated May 11, 1999, from Martin Hoffinger to Ron Sulisz.

In fact, Arrowhead has profited handsomely from the debtor, its sole customer. In May 1999, Arrowhead had assets in excess of $8,000,000 and would soon be receiving additional premiums in excess of $1,500,000 from the debtor. Martin Hoffinger assured Arrowhead's manager that this favorable premium relationship benefiting Arrowhead would continue until the JM Capital note was paid in full. (Defs.' Ex. 36, letter dated May 26, 1999, from Martin Hoffinger to Ron Sulisz, and Martin Hoffinger memo: Revised 6/18/99.)

Also: "Arrow[head] will continue to finance/capitalize JM from continuing premiums." Defs.' Ex. 36, Martin Hoffinger memo: Revised 6/18/99. Even after the $10,000,000 loan "[t]he Arrowhead equity balances in the Cayman Banks should be more than adequate to cover the exposure of any claims that may arise." Defs.' Ex. 36, letter dated June 22, 1999, from Martin Hoffinger to Ron Sulisz. In short, the debtor was once again financing its own borrowing.

Further, while in the process of scrutinizing the proposed transaction, the Cayman Islands management company confirmed that by entering into the proposed arrangement,

> the directors of Arrowhead are indicating that the investment in JM is being made out of assets surplus to Arrowhead's requirements for (a) paying its insurance and other liabilities and (b) maintaining net worth sufficient to support the business which Arrowhead will continue to write.

Defs.' Ex. 36, HSBC Insurance Management memo dated May 26, 1999, from Ron Sulisz to Martin Hoffinger. The Cayman Islands Monetary Authority approved the transaction by its letter of June 1, 1999. In that letter, the authority expressed its requirement that all reported claims had to be fully secured with both short-term funds and bonds. (Defs.' Ex. 36, letter dated June 1, 1999, from Gordon Rowell to Ron Sulisz.)

JM Capital was to take a security interest in all of the debtor's assets, "including everything that's not nailed down." Defs.' Ex. 36, the debtor's internal memo dated May 19, 1999. As stated above, this goal

---

**10.** The auditor drew no distinction between payments to PQA and Arrowhead. Arrowhead was initially funded by PQA. Payments to Arrowhead by the debtor began in 1994.

**11.** Martin Hoffinger was the Rule 30(b)(6) witness for both Arrowhead and JM Capital.

was not fully achieved. This raises the obvious question of whether the debtor adequately performed its duty to examine the JM Capital transaction and outstanding issues of validity, perfection, and priority at arm's length. The debtor did not. In fact, through its cash collateral efforts and the proposed plan of reorganization, the debtor has consistently attempted to treat JM Capital's debt as fully secured and payable not only by its terms, but on an accelerated basis.

Michael Monchick, a lawyer and a member of the debtor's board of directors, candidly set forth his concerns in his post-petition letter of October 3, 2001, to Robert Breakstone, another board member. Mr. Monchick expressed frustration over the failure of the debtor's counsel, with the assistance, or lack thereof, of Jennifer Dunn, to ensure that the JM Capital perfection documents were adequately recorded. He posits the following rhetorical, but very telling, question: "Why weren't all assets protected? A good question? People responsible did not do their job." Pls.' Ex. 77.

Mr. Monchick, a member of the *debtor's* board of directors, is more concerned about the creditor's perfection than the debtor's best interest. If unperfected, and as a result either unsecured or only partially secured, it would be in the debtor's best interest to treat JM Capital as such and propose a more limited payout under any proposed plan of reorganization. The debtor's plan of reorganization proposed a 30% payout to unsecured creditors with payment in full to JM Capital. Again, no explanation is given as to why Mr. Monchick is more interested in protecting JM Capital than in furthering the debtor's best interests in the context of its chapter 11 bankruptcy proceeding. The only valid resulting inference is that the secondary purpose of this transaction, like the earlier CPC loan, was to judgment-proof the debtor.

Martin Hoffinger shed some light on the debtor's attitude concerning this corollary benefit of the JM Capital transaction when he testified at the cash collateral hearing as follows:

Q. Who is a Director of Arrowhead?

A. I am.

Q. You are?

A. Yes.

Q. Who has control over whether Arrowhead pays money out on a claim or not?

A. I probably do.

Q. Anyone else?

A. We have-Terry Burke is Manager of the Britannia Insurance Management Company, and they are the managers of that account.

Q. Okay. What family members own Chief, which is the holding company for Arrowhead, which owns JM.?

A. To the best of my knowledge, my wife and four daughters.

Q. Okay. You're not an owner?

A. No, I'm not.

Q. And JM Capital loaned $10 million to Hoffinger Industries and refinanced the CPC note in about 1999?

A. That's correct.

Q. And this was to avoid people who have judgments from coming in and taking the assets of the company; correct?

A. It was just good business.

Q. Does good business include protecting your assets from judgment creditors?

A. Whatever is good business is what we practice.

Q. Could you please answer my questions, sir?

A. Please rephrase your question.

Q. Does good business include protecting your assets from judgment creditors?

A. Yes.

Defs.' Ex. 3 at 47.

At a board of directors meeting held March 22, 2001, JM Capital authorized its two directors, Martin Hoffinger and his son-in-law, Peter Caplin, to open a bank account at the Bank of Butterfield, located in the Cayman Islands. The account was opened by Martin Hoffinger executing the new account signature card on May 18, 2001, with an initial deposit of $1,000,000. (Defs.' Ex. 17.) Apparently, this is the first time JM Capital ever had a checking account. At trial Martin Hoffinger was not aware that JM Capital even had a checking account.

The JM Capital transaction was slated to occur on or about August 2, 1999. The $10,000.000 promissory note between the debtor and JM Capital is dated August 4, 1999. It is an interest only note for ten years, with interest payable annually commencing October 1, 1999, with the unpaid principal balance together with accrued interest to mature on August 4, 2009. (Pls.' Ex. 67.) The JM Capital UCC filing in Phillips County, Arkansas, occurred on August 25, 1999, (Pls.' Ex. 69) and with the Arkansas Secretary of State on September 13, 1999. The mortgage on real property in Phillips County, Arkansas, does not appear to have been filed of record. (Pls.' Ex. 71; see also Pls.' Ex. 79, memo dated November 20, 2003, from Martin Hoffinger to Michael Monchick.)

How this transaction actually occurred is very confusing and was not satisfactorily explained by the witnesses. It appears that almost every entity involved had an account with Salomon Smith Barney. It is unclear if the transfers in fact tracked from each account in turn or if certain entities bypassed a particular account and transferred consideration directly to the end beneficiary. (See Defs.' Ex. 50.) Were this transaction normal and at arm's length, there should have been first an executed $10,000,000 loan agreement and note between the debtor as borrower and JM Capital as lender. Either before or at execution of the JM Capital/debtor loan documents, Arrowhead would have capitalized or loaned JM Capital cash and securities equaling $5,000,000 (plus an additional $583,039 of which $524,271 was used to cover accrued interest due CPC as of August 2, 1999 (Defs.' Ex. 49.)). JM Capital would then have paid $3,250,000 directly to CPC (plus the additional amount to cover accrued interest (Defs.' Ex. 49.)). At the same time, JM Capital should have transferred $1,750,000, an amount representing the balance of the $5,000,000 in cash and securities, to the debtor for the debtor's stockholders as a distribution of their AAA accounts as of July 31, 1998. The debtor's records would have reflected the proportional distributions. JM Capital would also have executed the five $1,000,000 notes to the debtor, which the debtor would have then, in turn, assigned to CPC. CPC would have accepted the $3,500,000 in cash and securities (plus the additional amount to cover accrued interest (Defs.' Ex. 49.)) and the assignment of the five $1,000,000 notes in satisfaction of the original $8,250,000 loan. Subject to the nonrecourse issue addressed below, CPC would have accordingly released its mortgages and UCC filings and JM Capital would have then taken its place by filing its own mortgages and UCC filings.

Most of this did not occur as suggested. It appears more likely that the debtor, utilizing Midland Bank, engaged in a series of transfers through various Salomon Smith Barney accounts with Arrowhead transferring cash and securities directly to the debtor, bypassing JM Capital, and the

debtor directly transferring cash and securities to CPC. (Defs.' Ex. 50; Defs.' Ex. 36, memo dated June 24, 1999, from Martin Hoffinger to Norman Moss.) It also appears that by letter dated July 22, 1999, Peter Caplin, on behalf of JM Capital, instructed Arrowhead to skip transferring the $5,000,000 amount in cash and securities to JM Capital, but rather transfer that amount directly to the debtor's Salomon Smith Barney accounts on or about August 2, 1999. (Pls.' Ex. 63.) Likewise, at the direction of Martin Hoffinger, the cash and securities seem to have been transferred directly to the debtor's Salomon Smith Barney account from Arrowhead's account at the Bank of Bermuda. (Pls.' Ex. 72.)

The Court is not offended by, and surely the law does not preclude, instances where parties efficiently move money to effect a legitimate commercial transaction. However, in this instance there are legal consequences resulting from the total lack of any credible witness on behalf of JM Capital or the debtor having the ability to explain even remotely how either the CPC or JM Capital transactions actually occurred. This extends to the reasons for the transactions, the movement of money, the execution of documents, the existence of documents, the release or not of collateral, the taking or perfection of collateral, the continuation of perfection, and whose money was used when and directed to whom. In a normal, typical, arm's length transaction, all of these factors are clear and susceptible to easy reconstruction in a court of law. Accounting is accounting and math is math. When math, accounting, and financial transactions are married clarity—not confusion, dissimulation, or obfuscation—is the result.

This lack of clarity permeates both the CPC and the JM Capital transactions. CPC's Salomon Smith Barney account statements were directed to the attention of Ellen Lowe in Houston, Texas. (Defs.' Ex. 44.) JM Capital's Salomon Smith Barney account statements were directed to the identical address. (Defs.' Ex. 46.) Despite this unitary interest, Ms. Lowe did not appear and no one else could explain how the transfers actually occurred. As previously stated, only one of the necessary five $1,000,000 notes was ever produced. Not a single witness could testify unequivocally that they had ever seen the other four notes or any assignment or endorsement of the five notes to CPC. There is evidence that the debtor made interest payments on its debt to JM Capital, which apparently, through the Salomon Smith Barney accounts, was paid to CPC. In the year preceding its chapter 11 filing, the debtor paid JM Capital $797,671 in interest. (Pls.' Ex. 9, Sch. 3(b).) There is also evidence that at least two notes, of which only one was represented by an actual written promissory note, were paid in two $1,000,000 increments. (Defs.' Ex. 53, Sum. of Evid. of Payment Toward the 5 $1M Notes.) The other three nonexistent notes were never paid.

Once the debtor filed its chapter 11 petition and Arrowhead's income stream ceased, JM Capital was no longer able to make payments to CPC. Three $1,000,000 notes have become due and owing from JM Capital to CPC. Despite this fact, CPC has never made a demand or pursued collection from JM Capital, or made a claim against the debtor. Again, in a normal transaction it would be rare for the initial lender to accept third party notes (or, as in this case, non-existent third party notes) in full satisfaction of a debt, or without some recourse against the original maker, in this instance the debtor. Conversely, if the initial lender took the notes without recourse, the reasonable expectation is that someone on behalf of either CPC, JM Capital, or the debtor could explain the under-

lying logic, reason, or consideration. No one could in this instance.

Further, a setoff question presents itself. Specifically, Arrowhead claims it is owed approximately $5,000,000 in premiums from the debtor. The five $1,000,000 notes technically should be from JM Capital as maker to the debtor as lender/payee. JM Capital is Arrowhead's wholly-owned subsidiary and its sole source of funding, with Arrowhead's sole source of funding being the debtor. This stream was to continue, according to the debtor, as long as the JM Capital debt remained outstanding. In fact, the debtor would be obligated to prepay the JM Capital debt if it changed insurance carriers. (Pls.' Ex. 52.) Were this a true arm's length transaction, Arrowhead and JM Capital would simply assert a setoff of the outstanding obligations due under the balance of the five $1,000,000 promissory notes. This would result in an offset of $3,000,000, which it would simply refuse to pay to the debtor, or its alleged assignee, CPC. Neither Arrowhead or JM Capital has attempted to do so.

Further, no documents or credible testimony exist that would explain the relationship between JM Capital and CPC regarding the balance of the note obligations. JM Capital has missed three of the $1,000,000 payments, but CPC has not sued or even made demand on either JM Capital or the debtor. The debtor has made some of its interest payments to JM Capital post-petition by signing new promissory notes rolling the interest into the principle and paying interest accordingly. (*See, e.g.,* Pls.' Ex. 93.) According to its auditor, its CFO, and its president, the debtor is absolutely confident that CPC is paid in full as per its confirmation letter. That should not prevent JM Capital from asserting its right of setoff and leaving CPC apparently, but inexplicable, without recourse rights. Simply put, no one in this transaction seems to be operating in their own best interest. Also, no one seems capable of explaining either how the transaction actually took place or the parties' post-default actions, or lack thereof. Nor have they, with the exception of accounting entries, historically treated these as real debt obligations. Rather, each seems to be acting in a manner consistent with a unitary identity of interest; that is, paying the debtor's shareholders interest on their equity, with the secondary benefit of tying up the debtor's assets as collateral.

CASH COLLATERAL HEARING

On April 5, 2002, JM Capital filed its proof of claim in the amount of $10,557,808. No supporting documents are attached to the proof of claim. JM Capital asserts that it has a fully secured claim. The debtor has consistently treated JM Capital as fully secured during the course of this bankruptcy. This non-critical favoritism began as early as the debtor's initial post-petition efforts to obtain financing.

On October 10, 2001, shortly after the September 13, 2001, petition filing date, the debtor filed its Motion for Authority to Use Cash Collateral and Incur Secured Debt [the Cash Collateral Motion]. (Defs.' Ex. 1.) The Cash Collateral Motion envisioned a $10,000,000 line of credit from C.M.A. Corporation [CMA] with JM Capital agreeing to subordinate its August 4, 1999, $10,000,000 loan contingent upon adequate protection payments and a superpriority administrative expense claim. The Cash Collateral Motion discloses that there may be infirmities in JM Capital's perfection of its collateral, including a potential preference action. Throughout, the debtor has never taken any action to dispute or otherwise question JM Capital's fully secured status. In addition to seeking superpriority status for JM Capital,

the Cash Collateral Motion sought replacement liens and cross collateralization of prepetition indebtedness by those liens, as such would "preserve[ ] the collateral position of JM." Defs.' Ex. 1, Cash Collateral Mot. ¶ 13.

The Cash Collateral Motion does not contain any representations reflecting the ownership of JM Capital. Nor does it disclose JM Capital's relationship to Arrowhead or the absence of certain promissory notes essential to the credit relationship between the debtor, CPC, and JM Capital. In fact, the proposed cash collateral loan agreement involving CMA, JM Capital, and the debtor has the debtor waiving every claim, cause of action, or defense it might have against JM Capital. (Defs.' Ex. 1, Cash Collateral Mot. Ex. 1 § 3.15.)[12] This is especially egregious given the unwinding of the realities of the JM Capital transaction discussed in this opinion. It is almost impossible to fathom any valid or appropriate reason for the debtor to treat JM Capital as some disinterested arm's length third party insisting on a superpriority status in return for subordinating its already subordinated, and inadequately documented and perfected, debt.

The debtor's complicity, if not leadership, in this regard has been consistent throughout this bankruptcy proceeding, beginning with the Cash Collateral Motion, continuing through its first proposed plan, and now with its position at the trial of this matter. As is evident from the facts, the debtor and JM Capital—under the direction of Martin Hoffinger—have acted with a unity of purpose inconsistent with the fiduciary duties of a debtor-in-possession, including its duty to act in good faith and in the debtor's best interest for the benefit of the estate and its creditors.

As a result of the cash collateral hearing, the debtor obtained the requested post-petition financing, but the Court ordered that payments to Arrowhead and JM Capital should be held in abeyance. In the interim, Bunch filed this adversary proceeding attacking the validity of the JM Capital and Arrowhead claims.

## RECHARACTERIZATION / RECLASSIFICATION [13]

■ Some courts will not recharacterize a loan from debt to equity; instead, these courts consider recharacterization as part of the court's equitable subordination powers under § 510(c). *See, e.g., Unsecured Creditors' Comms. of Pacific Express, Inc. v. Pioneer Commercial Funding Corp. (In re Pacific Express, Inc.),* 69 B.R. 112, 115 (9th Cir. BAP 1986). The basis for that reasoning relates to the results obtained if a loan is recharacterized; specifically, the recharacterization has the *effect* of subordinating the loan because capital contributions would be repaid only after all other corporate obligations have been met. The *Pacific Express* court believed that where a specific provision of the code governs the

---

**12.** The proposed waiver provision, section 3.15, was amended in the final agreement and was the subject of this Court's order denying JM Captial's motion for summary judgment, which order is still valid and incorporated by reference. The Court notes that the following language did not survive and was not incorporated in the final loan agreement approved by the Court:

> Provided however, the right of a Creditor's committee or other party in interest to object to the pre-petition claims of JM or

bring suit ex rel, the DIP on any claim waived pursuant to this paragraph shall be preserved for a period of sixty (60) days following the entry of an order of the United States Bankruptcy Court approving this Agreement.

Defs.' Ex. 1, Cash Collateral Mot. Ex. 1 § 3.15.

**13.** These terms are frequently used interchangeably; here, the Court will use the term recharacterization.

determination made, in this case subordination, the court could not use its equitable powers to make the same determination. To do so would be using its equitable powers in a manner inconsistent with the provisions contained in the code. *Id.* However, this line of reasoning does not take into account the purpose of recharacterization, which is to determine the *existence* of a debt, not to decide whether the debt should be subordinated. If there is no debt, equitable subordination is not an issue, although de facto subordination is a consequence.

■■■ The power of bankruptcy courts to recharacterize a loan from debt to equity comes from the courts' general equitable powers contained in § 105(a), which states that the court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). According to the Supreme Court, "[i]n the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate." *Pepper v. Litton*, 308 U.S. 295, 307–08, 60 S.Ct. 238, 84 L.Ed. 281 (1939). According to the *Pepper* Court, "a bankruptcy court has full power to inquire into the validity of any claim asserted against the estate and to disallow it if it is ascertained to be without lawful existence." *Id.* at 305, 60 S.Ct. 238. The determination of whether a transaction is debt or equity falls within the powers granted to this Court by § 105(a).

■■■ In determining whether a debt should be recharacterized as an equity contribution, courts generally review the following factors:

(1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed matu-

rity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments.

*Roth Steel Tube Co. v. Commissioner of Internal Revenue*, 800 F.2d 625, 630 (6th Cir.1986). In addition to the above factors, some courts also consider (1) the right to enforce payment of principal and interest; (2) participation in management flowing as a result of the transaction; (3) the intent of the parties; and (4) the failure of the debtor to repay the obligation on the due date or to seek postponement. *See, e.g., In re Cold Harbor Assocs.*, 204 B.R. 904, 915 (Bankr.E.D.Va.1997). The factors are applied to a particular case and transaction keeping in mind the specific circumstances surrounding the case. The list is not exclusive and no one factor is controlling or decisive. *Roth Steel Tube Co.*, 800 F.2d at 630. Of primary concern is whether the transaction "carries the earmarks of an arm's length bargain." *Pepper*, 308 U.S. at 306–07, 60 S.Ct. 238; *Cold Harbor Assocs.*, 204 B.R. at 915. The more characteristics of an arm's length transaction that are present, the more likely the transaction would be treated as debt instead of an equity contribution. *Cold Harbor Assocs.*, 204 B.R. at 915.

■■■ JM Capital's claim must be recharacterized as equity in its entirety. Any liens or security interests it has or asserts

in the debtor's case are hereby set aside. A number of factors compel this result.

The principal purpose of the JM Capital transaction in 1999 was to perpetuate the CPC transaction, which was never a true arm's length credit transaction. Rather, both the CPC transaction and the JM Capital transaction were designed to pay interest on shareholder equity. The secondary purpose was to fully encumber all of the debtor's assets to the detriment of its unsecured creditors, including potential tort judgment creditors. The Court draws no conclusion as to the appropriateness in an accounting context of structuring transactions of this nature to pay interest on equity. The Court does conclude that the principles of recharacterization require that this relationship be accurately defined for purposes of plan confirmation and commensurate distribution in a chapter 11 reorganization.

The debtor's CFO, the debtor's outside auditor, and Martin Hoffinger each acknowledged that the purpose of the CPC and JM Capital transactions was to pay interest on shareholder equity. This return was significant over the years. Generally, in closely held subchapter S corporations, the shareholders expect the corporation to distribute enough money to address the tax consequences of undistributed earnings. In this instance, commencing in late 1993, through their ownership of CPC and JM Capital outlined above, the debtor's shareholders received interest payments of well over $500,000 a year. Not all the years can be precisely quantified from the debtor's books and records. However, distributions of $497,438 in 1995, $808,791 in 1997, $741,904 in 1998, $742,500 in 1999, $878,400 in 2000, and $797,671 in 2001

serve to illustrate the point. Additionally, the shareholders received an additional $6,750,000 in 1999 through the JM Capital transaction, $1,750,000 in an additional distribution, and the $5,000,000 that was transferred to CPC, an entity owned by eleven Hoffinger family members who were also each shareholders of the debtor.

As previously discussed, the original CPC transaction involved little more than check kiting, the effect of which was to benefit the debtor's shareholders with substantial interest payments, including an additional $6,750,000 being transferred to the shareholders in 1999. This, and judgment-proofing the debtor, was the purpose of the CPC and JM Capital transactions. Therefore, if not recharacterized, the net effect of the JM Capital transaction would be to perpetuate a nonexistent loan that has netted the debtor's shareholders well over $12,000,000 [14] in the eight years before the debtor filed its bankruptcy case— November 1993 to September 2001. Additionally, to let the debt stand as is would net the debtor's shareholders an additional $12,000,000 in the form of accrued principal and interest to be paid under a confirmed plan of reorganization, all from this nonexistent original credit and to the detriment of all other creditors of this debtor.

The JM Capital transaction was not for any traditional legitimate business purpose. *Ab initio*, Martin Hoffinger on behalf of the debtor simply could not explain why the debtor, in effect, funded its own borrowing in the original CPC transaction, other than to offer that it was simply structured to pay interest on equity. Likewise, no one offered a credible explanation as to why the JM Capital transac-

---

**14.** This figure results from taking the known interest payments discussed above, the unknown interest payments in the unquantified years estimated to be at least $500,000 annually, and the additional $6,750,000 in 1999.

tion took place in 1999. The only explanation given was because the CPC loan was coming due, which is simply incorrect. The CPC loan was not scheduled to mature until October 2003.

The JM Capital transaction was poorly, inaccurately, and incompletely documented. Neither the note or loan agreement adequately defined the interest rate. It is clear that the appropriate collateral documents were not properly perfected. Regardless, the debtor has made no effort to treat JM Capital as anything other than a fully secured creditor. The credit transactions, both initially with CPC and then later with JM Capital, had no purpose in assisting the debtor in its operations. The debtor had no credit need for signing either note. No capital improvements resulted from the credit, and the credit was not incurred for operational or typical line of credit purposes. The JM Capital note was an interest only note with no reductions in principal until maturity for a 10 year period which, when viewed collectively with the CPC transaction, created an interest only loan for 16 years.

Only one of the five $1,000,000 promissory notes called for in the JM Capital transaction even exists. The other four notes do not exist, nor was any assignment document ever executed. There is no explanation why in 1999 CPC accepted these non-existent notes in full satisfaction of the debt without recourse to the debtor. Further, it appears CPC has taken no steps to effect collection against JM Capital. Sadly, JM Capital's sole source of funds for its obligations to CPC appears to be the excessive premiums the debtor paid and was to pay to Arrowhead. Martin Hoffinger, in his correspondence and memos, acknowledges these premiums are well in excess of Arrowhead's concomitant insurance obligations back to the debtor.

Even though the transaction involved a loan agreement and promissory note, the transaction failed to include the interest rate and was incompletely documented. Although there was a fixed maturity date, there were no scheduled payments reducing principal. The CPC and JM Capital transactions taken together reflect at least 16 years of deferred payment on principal. As previously stated, the interest rate is unclear from the documents. Four of the incremental $1,000,000 promissory notes were never drafted, executed, delivered, or assigned. The source of repayment is the debtor's excessive premiums to an insurance company wholly controlled by members of the Hoffinger family, each one a stockholder of the debtor. Only Hoffinger family members, each one a stockholder of the debtor, benefitted from these transactions. This debt, with its commensurate collateral, judgment-proofed the debtor to the detriment of its unsecured creditors. It is apparent that the debtor could have obtained outside financing, or utilized its occasionally enviable cash position, if, in fact, it truly wanted to distribute earnings. While the JM Capital credit was subordinated to outside secured creditors, the collateralization acted to the detriment of outside unsecured creditors. No capital assets were purchased with the credit extended and the debtor, using excessive premiums to Arrowhead, created a fund outside the reach of its creditors from which to effect repayment. Further, none of the parties acted in their own best interest or sought to enforce the obligations of the respective parties. Instead, each acted with a complete identity of interest as directed by Martin Hoffinger.

This simply is not debt. The debtor funded (or, more accurately, kited) its own loan from CPC. Then, through excessive premiums to Arrowhead, the debtor funded JM Capital's ability to pay CPC, all to the benefit of the debtor's shareholders,

and those of Arrowhead/Chief, CPC, and JM Capital, inclusively one and the same. If not recharacterized, then the same shareholders would enjoy both the benefits of receiving interest on equity and the inconsistent benefit of having that equity treated as debt, thus enjoying an additional windfall. The ever compliant debtor, in its initial plan of reorganization, proposed to treat JM Capital as fully collateralized perfected debt, thus awarding JM Captial priority and full payment. The same proposed plan intended to pay unsecured creditors 30% on the dollar, with Bunch, for no discernible reason, receiving less. The purpose of the JM Capital transaction was not to incur debt necessary to the debtor's operations; its purpose was to pay interest on equity and to judgment-proof the debtor. If it was equity before filing, then surely it is equity now. The alleged debt is recharacterized accordingly.

## RECONSIDERATION OF CLAIM

■ Under § 502(j), the court can reconsider an allowed or disallowed claim for cause, and then either allow or disallow the claim according to the equities of the case. 11 U.S.C. § 502(j). "Cause" is not clearly defined in the code. Accordingly, several courts equate a motion for reconsideration of claim with a motion for relief from judgment under Federal Rule of Bankruptcy Procedure 9024, which incorporates Federal Rule of Civil Procedure 60. *In re Gomez*, 250 B.R. 397, 400 (Bankr.M.D.Fla.1999); *see also Kirwan v. Vanderwerf (In re Kirwan)*, 164 F.3d 1175, 1177 (8th Cir.1999) ("This rule [60(b)] may be liberally construed to do substantial justice to allow parties to air meritorious claims in the absence of fault or prejudice."). Rule 60(b) permits a court to take into account mistake, inadvertence, surprise, excusable neglect, newly discovered evidence, fraud, a void or satisfied judgment, or any other reason justifying relief.

According to the Fifth Circuit Court of Appeals, however, the standards listed in Rule 60(b) are only applicable when a claim was actually litigated. *Gomez*, 250 B.R. at 400. In cases where the claim was not actually litigated, a court should consider the following factors to determine whether sufficient cause was shown: "(1) the extent and reasonableness of the delay, (2) the prejudice to any party in interest, (3) the effect on efficient court administration, and (4) the moving party's good faith." *Id.* (citing *In re Bernard*, 189 B.R. 1017, 1022 (Bankr.N.D.Ga.1996) and other cases).

■ The standards enumerated by the *Gomez* court are similar to those the Eighth Circuit Court of Appeals considers appropriate when a bankruptcy court exercises its discretion and reconsiders a claim under § 502(j). Specifically, a bankruptcy court may consider "whether delay would prejudice the debtors or other creditors, the reason for the delay and its length and impact on efficient court administration, whether the creditors acted in good faith, whether clients should be penalized for counsel's mistake or neglect, and whether claimants have a meritorious claim." *Kirwan*, 164 F.3d at 1177–78.

■ JM Capital attempted to interpose defenses based on Federal Rule of Bankruptcy Procedure 9024 in its motion for summary judgment. This Court has already concluded that the principles of res judicata or collateral estoppel do not conclusively prevent the Court from considering the issues raised in this adversary proceeding. However, to the extent that any argument exists that the defendants' proofs of claim have been previously litigated and considered, the Court specifically finds that their claims may be reconsidered pursuant to § 502(j) and Federal Rule of Bankruptcy Procedure 9024. Fur-

ther, applying the standards set forth by the Eighth Circuit to the facts of this case, the Court finds that cause exists to reconsider the claims of JM Capital and, later in this opinion, Arrowhead Insurance.

█ JM Capital's proof of claim is hereby disallowed. First, the claim has been recharacterized as equity. Second, as is evident from the above discussion, the facts clearly demonstrate that JM Capital's claim does not, and should not, represent fully collateralized secured debt. JM Capital and the debtor have acted in concert, delicately ignoring realities known exclusively by them; specifically, that the JM Capital debt was funded by the debtor and its real purpose was not debt, but to pay interest on equity, with the secondary benefit of judgment-proofing the debtor. Bunch has indeed acted in good faith; JM Capital has not. In this case, no distributions have been made and, thus, no party has been prejudiced. The Court finds that JM Capital does not have a meritorious claim as a secured creditor.

## EQUITABLE SUBORDINATION
### Standing

█ Courts generally disagree whether individual creditors have standing to pursue equitable subordination claims against other creditors. The Eighth Circuit Court of Appeals briefly touched upon this issue in a 1985 decision, *Vreugdenhil v. Hoekstra*, 773 F.2d 213 (8th Cir.1985). In discussing standing to bring particular actions against an estate, the Eighth Circuit held that certain actions could be brought only by the trustee of the estate. In *Vreugdenhil*, the debtors filed a voluntary chapter 11 petition in January 1983. In October 1984, the case was converted to a case under chapter 7. Shortly after the conversion, the debtors initiated a collateral action in district court stating eight causes of action: (1–2) two claims to deter-

mine the nature, validity, extent, and priority of liens; (3) a request to use property of the estate in the ordinary course of its business; (4) a request to avoid or subordinate certain security interests; (5) a claim for contempt for violations of the automatic stay; and (6–8) three tort claims based on allegations of property damage. *Id.* at 214. The Eighth Circuit found that the district court properly dismissed the debtor's suit because each of the causes of action involved property of the estate in bankruptcy and the debtor's trustee-like authority as debtors-in-possession ended when the case was converted to chapter 7. According to the Eighth Circuit, "a debtor may not prosecute on his own a cause of action belonging to the estate unless that cause of action has been abandoned by the trustee." *Id.* at 215. Citing to 11 U.S.C. §§ 363, 544–550, and 774, the court stated that "with certain exceptions not applicable here, it is the trustee who is empowered under the Code to avoid or subordinate security interests and liens, and to use, sell, or lease property of the estate in the ordinary course of business." *Id.*

█ In the code provisions cited by the Eighth Circuit, §§ 363, 544–550, and 774, the trustee is the specific entity holding the avoidance powers allowed under the code. According to the Supreme Court, "Congress 'says in a statute what it means and means in a statute what it says there.'" *Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000) (quoting *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992)). The Court listed three contextual features in support of its conclusion of exclusivity:

(1) when a statute authorizes specific action and names the party empowered to take that action, it is not appropriate to presume nonexclusivity; (2) because

the trustee plays a unique role in bankruptcy proceedings, it is plausible that Congress provided a power to him and not to others; and (3) had Congress intended the code provision to be broadly available, it could have said so.

*Rice v. United States d/b/a Internal Revenue Serv. (In re Odom Antennas, Inc.),* 258 B.R. 376, 384 (Bankr.E.D.Ark.2001) (citing *Hartford Underwriters Ins. Co.,* 530 U.S. 1, 120 S.Ct. 1942).

 Notably absent from the code provisions cited by the Eighth Circuit is § 510(c) dealing with equitable subordination. Section 510(c) provides that, "after notice and a hearing, the court may ... under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of an allowed interest." 11 U.S.C. § 510(c). There is no specific provision in the statute that states that an equitable subordination claim must be brought by the trustee. In fact, the statute is silent in this regard. Utilizing the contextual features recognized by the Supreme Court, it is apparent that Congress intended for § 510(c) to be broadly available. Had the trustee been the only party with authority to use this section, Congress could have so stated, as it has in many instances.

In their objection to the standing of Bunch to bring the equitable subordination action, JM Capital and Arrowhead ask the Court to follow the reasoning contained in *Variable–Parameter Fixture Dev. Corp. v. Comerica Bank, Calif. (In re Morpheus Lights, Inc.),* 228 B.R. 449 (Bankr.N.D.Cal. 1998). *Morpheus* introduced a mechanical standard by which courts can determine standing in an equitable subordination case. First, the court must determine the holder of the claim. If only the creditor holds the claim—in other words, has a

"particularized injury"—then it has standing to pursue its claim. If, on the other hand, the injury is general, then the estate holds the claim and only a representative of the estate is the proper party to bring the claim. *Id.* at 453. According to the *Morpheus* court, "[s]uch an analysis is necessary to promote the orderly and equitable administration of the bankruptcy estate by preventing individual creditors from pursuing separate actions to the detriment of other creditors and of the estate as a whole." *Id.* To determine whether a claim is property of the estate or of an individual creditor, the court must first determine whether the claim is a general claim or a particular claim. A claim is general if there is no particular injury arising from the claim, and any creditor of the debtor could bring the claim. *Id.* If it is a general claim, then, according to *Morpheus,* only the trustee, or debtor in possession, is the proper person to bring the claim.

If the Court were to follow the reasoning in *Morpheus,* it would first have to determine if Bunch has standing by virtue of a particularized harm to bring an equitable subordination claim. If successful, Bunch, as well as other unsecured creditors, would receive an increased distribution from the estate. Conversely, in the absence of equitable subordination, Bunch and other unsecured creditors are each suffering harm in the form of a reduced distribution. Under a *Morpheus* analysis, Bunch would probably lack standing.

However, this Court recognizes that there will always be at least one or more other creditors the alleged generalized harm has not harmed, and the cure will not benefit; specifically, the creditor(s) against whom the action is brought. In this case it is Arrowhead, an unsecured creditor, and JM Capital, a secured creditor. Because of this, the Court questions

whether there can ever be a "general" equitable subordination claim that only belongs to the trustee or debtor-in-possession. The specific wording of § 510(c) recognizes this in the "all or part of another allowed claim" language. It would be absurd to permit the estate alone to seek to reorder priorities among specific creditors on all or part of their debt; that concept alone defines particularized harm to specific creditors.

This is perhaps especially so in this instance where the debtor, for now obvious reasons, has shown no interest in contesting JM Capital's proof of claim. Bunch has a particularized injury and may share that injury with other creditors of this estate, but she does not share it with all creditors of this estate. It is simply not logical to suggest that if many are harmed, then no more than one of the harmed may pursue the action. Certainly the debtor could have brought an equitable subordination suit, and as such, its claim is property of the estate. However, the claims of other parties belong to them and are not property of the estate. This bankruptcy case was filed as a result of the Bunch verdict. Many of the debtor's actions, alone and in concert with JM Capital, appear to be directed specifically at Bunch in an effort to minimize her distribution. The code permits her to address this harm, and she has done so.

Additionally, as discussed above, it is not logical to put such restrictions on § 510(c) in contravention of the plain language of the statute. Recognizing that the remedy contained in § 510(c) is broadly available under the code, the Court finds that Bunch has standing to pursue an equitable subordination claim against JM Capital and Arrowhead.

*In re Mobile Steel Co.*

■■■ The doctrine of equitable subordination is recognized in the code. As stated above, § 510(c) provides that, "after notice and a hearing, the court may ... under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of an allowed interest." 11 U.S.C. § 510(c). Application of the doctrine is at the discretion of the court. *BankWest, Inc. v. United States, Farmers Home Admin.*, 102 B.R. 738, 741 (D.S.D.1989); *see also Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 744 (6th Cir. 2001) (stating that a court is permitted to, not required to, subordinate a claim). The test that most district courts and courts of appeal follow is found in *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692 (5th Cir.1977). *United States v. Noland*, 517 U.S. 535, 538–39, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996) (recognizing *Mobile Steel* as an "influential" opinion). It is a three-part test that requires the following: " '(i) The claimant must have engaged in some type of inequitable conduct. (ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant. (iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy [Code].' " *Bergquist v. Anderson–Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.)*, 850 F.2d 1275, 1282 (8th Cir.1988) (quoting *Wilson v. Huffman (In re Missionary Baptist Found.)*, 712 F.2d 206, 212 (5th Cir.1983) and citing other cases).

■■■ The *Mobile Steel* court also recognized three principles a court must keep in mind when determining whether the conditions for equitable subordination have been met. First, "inequitable conduct directed against the bankrupt or its creditors may be sufficient to warrant subordination of a claim irrespective of wheth-

er it was related to the acquisition or assertion of that claim." *Mobile Steel,* 563 F.2d at 700. Second, "a claim or claims should be subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct." *Id.* at 701. And third, the objecting party must come forward with enough evidence to " 'overcome the claimant's prima facie case and thus compel him to actually prove the validity and honesty of his claim.' " *Id.* (quoting 3A J. Moore & L. King, Collier on Bankruptcy, ¶ 63.06, at 1785 (14th ed.1976)). The purpose of equitable subordination is to "undo or offset any inequity in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results." *Bostian v. Schapiro (In re Kansas City Journal–Post Co.),* 144 F.2d 791, 800 (8th Cir.1944). This is a power that must be "measuredly and not blankly exercised.... It should not operate to take away anything punitively to which one creditor is justly entitled ... and bestow it upon others, who in the relative situation have no fair right to it." *Id.* at 800–01. The Supreme Court recognizes this limited exercise of a court's power to equitably subordinate a claim as appearing in the third prong of the *Mobile Steel* factors. It stated that although a bankruptcy court is a court of equity, " 'it is not free to adjust the legally valid claim of an innocent party who asserts the claim in good faith merely because the court perceives that the result is inequitable.' " *Noland,* 517 U.S. at 539, 116 S.Ct. 1524 (quoting DeNatale & Abram, *The Doctrine of Equitable Subordination as Applied to Nonmanagement Creditors,* 40 Bus. Law. 417, 428 (1985)).

██ In order to determine whether equitable subordination is appropriate, the court must first determine whether the creditor engaged in some sort of inequitable conduct. Without a showing of inequitable conduct, the remaining two prongs of the test are not applicable and the court cannot subordinate the claim. *In re Lifschultz Fast Freight,* 132 F.3d 339, 344 (7th Cir.1997); *Bellanca Aircraft Corp.,* 850 F.2d at 1282–83; *Farmers Bank of Clinton v. Julian,* 383 F.2d 314, 323 (8th Cir. 1967) (" 'fraud or unfairness' (unfairness is equated with inequity) is essential for a decision to subordinate"). The amount of inequitable conduct depends on the status of the claimant. If the claimant is an insider of the debtor, its conduct is closely scrutinized and the only proof required is that it breached a fiduciary duty or engaged in conduct that is somehow unfair to other creditors. *Id.* at 1282 n. 13. Typically, inequitable conduct falls into one of the following categories: (1) fraud, illegality, or breach of fiduciary duties; (2) undercapitalization; or (3) the creditor's use of the debtor as a mere instrumentality or alter ego. *Lifschultz Fast Freight,* 132 F.3d at 344–45.

██ As stated above, this Court has already determined that JM Capital's claim must be recharacterized as equity. Alternatively, it is clear that the necessary grounds exist to equitably subordinate JM Capital's claim to the claims of all other secured and unsecured creditors of this debtor.

The first element, that requiring "inequitable conduct," is met. While the debtor and JM Capital are separate entities, each are controlled by Martin Hoffinger. Again, this Court renders no decision on the tax or accounting appropriateness of paying shareholders interest on their equity, nor does this Court pierce the corporate veils. However, it is clear that the primary purpose of the 1999 JM Capital transaction, as discussed above, was not to incur typical debt necessary for the debtor's operations, but to pay interest on equi-

ty. It also had the intended secondary benefit of judgment-proofing the debtor by encumbering its assets to the ultimate benefit of members of the Hoffinger family.[15] Martin Hoffinger knew this. He, the CEO of the debtor, and also JM Capital's Rule 30(b)(6) witness and representative at trial, knew these facts and that there were perfection issues with the JM Capital credit. Martin Hoffinger also knew that, with one exception, the notes from JM Capital to the debtor did not exist and had not been assigned to CPC. The pleadings, the cash collateral motions, the use of excess premiums to Arrowhead to fund the credit, the payment to CPC based on essentially a non-existent debt, the transcript of the cash collateral hearing, the proposed plan treatment, the JM Capital proof of claim, and the waiver attempts in the cash collateral agreement and the plan, all point to a deliberate effort to ignore these known facts and, after having paid the stockholders millions over the eight years before the petition was filed, treat this as an arm's length fully secured debt. This would result in the debtor paying JM Capital several more millions, all ultimately to the benefit of Hoffinger family member stockholders, while paying its creditors, including Bunch, a minimal percentage figure.

■ The bankruptcy court is a court of equity possessing the inherent power to " 'prevent the consummation of a course of conduct by a claimant which would be fraudulent *or otherwise inequitable* by subordinating his claim to the ethically superior claims asserted by other creditors.' " *Limerick v. Limerick* (*In re Answerfone, Inc.*), 48 B.R. 24, 27 (Bankr.E.D.Ark.1985) (quoting *Mobile Steel,* 563 F.2d at 699) (emphasis added). Martin Hoffinger used entities he controlled to pay interest on

equity. It was never debt, and is fairly recharacterized as equity. It would be inequitable, viz unfair, to allow Mr. Hoffinger and his family to reap the benefits of that interest, as well as some actual cash distributions against accumulated earnings, and then in turn use the same vehicle to assert that this was always intended to be true debt that should be paid before the claims of third parties—persons who have actually extended credit or are valid judgment creditors of this debtor.

All three elements of equitable subordination are met. The conduct of JM Capital, controlled and acting at the direction of Martin Hoffinger, with the complicity of the debtor, another entity controlled by Mr. Hoffinger, is inequitable. Again, the Court makes no finding of the initial appropriateness of the interest paying vehicle structured by Martin Hoffinger. But the continuation of this fiction in the course of this bankruptcy proceeding cannot be countenanced by this Court. As suggested by the court in *Mobile Steel,* this Court may consider the inequitable conduct directed against the debtor or its creditors, "irrespective of whether it was related to the acquisition or assertion of that claim." *Mobile Steel,* 563 F.2d at 700. As stated by the Eighth Circuit in *Kansas City Journal–Post Co.,* and cited with approval by the *Mobile Steel* court:

[I]n dealing with creditors' claims in a bankruptcy proceeding, the "subject matter in litigation" . . . goes beyond the legal foundation and legal structure of the individual claim. For claim and distribution purposes, a bankruptcy proceeding is an integrated proceeding, and the "subject matter in litigation" in its practical aspect is the right of creditors to share in the bankruptcy assets them-

---

**15.** *See* Pls.' Ex. 77, post-petition letter dated October 3, 2001, from Michael Monchick, member of the debtor's board of directors, to another director ("Why weren't all assets protected? A good question. People responsible did not do their job.").

selves, not merely legally but in equitable relation to each other—for the assertion of a claim in bankruptcy is, of course, not an attempt to recover a judgment against the debtor but to obtain a distributive share in the immediate assets of the proceeding. The inequity which will entitle a bankruptcy court to regulate the distribution to a creditor, by subordination or other equitable means, need not therefore be specifically related to the creditor's claim, either in its origin or in its acquisition, but it may equally arise out of any unfair act on the part of the creditor, which affects the bankruptcy results to other creditors and so makes it inequitable that he should assert a parity with them in the distribution of the estate . . . .

*Kansas City Journal–Post Co.,* 144 F.2d at 803–04.

These continuing actions have injured other creditors of the debtor and conferred an unfair advantage on JM Capital. Subordination in this instance is consistent with the provisions of the bankruptcy code. Accordingly, if recharacterization is inapplicable, then the claim of JM Capital must be and is hereby subordinated to the claims of all other secured and unsecured creditors. Any lien or security interest it may claim is hereby set aside.

ADMINISTRATIVE CLAIM—ARROWHEAD

Arrowhead filed an administrative claim for post-petition products liability insurance coverage from September 13, 2001, to December 1, 2004, in the amount of $5,178,500. Bunch has asked the Court to recharacterize, reconsider, or equitably subordinate Arrowhead's claim. Arrowhead also seeks post-petition stop loss insurance premiums, commencing September 13, 2001, through October 2004 of $228,983. The stop loss insurance premiums are approved for all amounts accrued post-petition. The products liability insurance premiums require greater scrutiny.

The Court may award an administrative expense priority under § 503(b) for the "actual, necessary costs and expenses of preserving the estate . . . ." 11 U.S.C. § 503(b)(1). It is undisputed that the debtor requires and needs insurance to market and distribute its products adequately.

Arrowhead is owned by a Cayman Islands company, Chief Enterprises, Ltd. The debtor is Arrowhead's only customer. Chief is owned by five Hoffinger family members, Lorraine Hoffinger, Candace Caplin, Joyce Bloom, Ellen Lowe, and Shayna Chazin. All five are shareholders in the debtor. (Dfs.' Exs. 18 and 20.) The Arrowhead products liability policy is titled an Indemnification Policy for Product Liability Coverage [Policy]. (Pls.' Ex. 35.) The initial policy was issued November 23, 1994. The essential coverage terms were $500,000 per occurrence, a $50,000 deductible, and a $3,000,000 annual liability limit. The annual liability limit was increased to $5,000,000 effective September 1, 1996. Subsequently, effective September 11, 2003, the per occurrence coverage was increased to $1,000,000. Tail coverage is provided as of October 1, 1987.

In defending the appropriateness of the premiums assessed, Arrowhead attaches significant value to the October 1, 1987, retroactive tail coverage. However, the following statement appears in Arrowhead's April 26, 2000, Business Plan: "The total funding for the retroactive period was US$4,303,985 for 19 known claims. Subsequent to the initial funding, it was decided to distribute assets no longer considered to be required to fund this retroactive period, totaling US$4,234,527." Pls.' Ex. 76.

Post-petition, Michael Monchick, a member of the debtor's board of directors,

questioned the Arrowhead premium expense in his letter of October 3, 2001, postulating to another board member as follows:

Other insurance coverage: this should be addressed. I spoke with Jennifer Dunn to ascertain what it would cost for outside insurance. She advised me that three years ago she got a quote from Aon (sp?) with a per case cap of $3 Million and a total cap per year for all cases of either $5 Million or $7 Million (she was unsure of which) at a cost of $800,000 per year and that she could have gotten another $1.5 million umbrella for $300,000 per year. She said she was asked about our products liability insurance policy at the initial bankruptcy meeting and she advised that she did not handle same. I assume that the fact that Hoffinger Industries pays $1.7 Million for coverage of $500,000 per case with a cap of $5 Million annually is going to be met with suspect (sic) by the bankruptcy court and those payments may cease during the bankruptcy reorganization period.

Pls.' Ex. 77, letter dated October 3, 2001, from Michael Monchick to Robert Breakstone, at 3.

The debtor did obtain a post-petition quote from an outside insurer for products liability coverage at $1,000,000 per occurrence, $5,000,000 aggregate annual limit, with a $50,000 deductible. The annual premium, including commission, was $867,698. This policy did not include tail coverage retroactive to 1987. (Defs.' Exs. 67 and 69.) According to Ronald Hanstein, the entity making this quote later declined the risk.

As per the Policy, premiums were as follows (Defs.' Ex. 21):

| Period | Amount |
| --- | --- |
| September 1, 1994, to August 31, 1995 | not specified on Policy declarations page. $1,876,000 as per invoices. (Defs.' Ex. 22.) |
| September 1, 1995, to August 31, 1996 | $1,840,633 |
| September 1, 1996, to August 31, 1997 | $1,675,000 |
| September 1, 1997, to August 31, 1998 | endorsement not attached to Policy. As per examiner's report, $1,622,400 as of 7/31/98. (Defs.' Ex. 58.) |
| September 1, 1998, to August 31, 1999 | endorsement not attached to Policy. As per invoiced, $1,560,000. (Defs.' Ex. 22.) |
| September 1, 1999, to August 31, 2000 | $1,560,000 |
| September 1, 2000, to August 31, 2001 | $1,560,000 |
| September 1, 2001, to August 31, 2002 | $1,560,000 |
| September 1, 2002, to August 31, 2003 | $1,560,000 |
| September 1, 2003, to August 31, 2004 | $1,280,000 (per occurrence increased to $1,000,000 September 11, 2003). |
| September 1, 2004, to August 31, 2005 | $1,280,000 |
| TOTAL | $17,374,033 (includes post-petition premiums not paid) |

As discussed above, prior to 1994 the debtor self-insured through PQA. (Pls.' Ex. 76 at 1, ¶ 2.) According to the debtor's auditors:

The Company is a defendant in additional lawsuits arising from incidents of personal injury and property damage which occurred during the use of the Company's products. Periodically, the Company evaluates the costs and benefit of purchasing liability insurance coverage for such claims. For significant periods of time since October 1987 and as of June 30, 1993 the Company has elected not to purchase such coverage.

Defs.' Ex. 27, Fin. State. June 30, 1993, n. 7.

Arrowhead's only customer is the debtor. As is evident from the discussion above, it has been a very profitable relationship for the insurance company. Despite this self-evident fact, the debtor never compared premiums paid to indemnity obligations met, an inexplicable lapse of

business acumen. As Martin Hoffinger said in his May 11, 1999, letter to Arrowhead's Cayman Islands manager, "[t]he costs to Arrowhead for claims paid, from the inception of Arrowhead, has been minimal." Defs.' Ex. 36. In May 1999, Arrowhead had assets in excess of $8,000,000, with an expectation of receiving an additional $1,500,000 in premiums from the debtor. Arrowhead funded the $10,000,000 1999 JM Capital/debtor transaction. In May 1999, Martin Hoffinger represented to Ron Sulisz with BSBC Insurance Management that:

> The financial condition of the Hoffinger Co. as indicated should be reassuring as to the viability of the Hoffinger company. Hoffinger Industries will be continuing to place its insurance with Arrowhead until the loan is repaid. Hoffinger would be obliged to pre-pay the notes should it choose to change insurance carrier. The premiums paid by Hoffinger exceeds the amount of the notes payable, building the asset base of Arrowhead as it funds the payment of the notes.

Pls.' Ex. 52.

Arrowhead was managed at different times by at least two Cayman Islands management companies. It has no offices other than a post office box and the management company. None of the witnesses could testify that the insurance company ever had any employees, other than maybe a paralegal. Martin Hoffinger testified that while Terry Burke (and Ron Sulisz at another time) might manage the company, it was unlikely that Mr. Burke would make insurance or lending decisions without Mr. Hoffinger's involvement. Martin Hoffinger was Arrowhead's Rule 30(b)(6) witness

and representative at trial. Arrowhead and JM Capital prepare consolidated financial statements. Martin Hoffinger testified that JM Capital did not have an account with Salomon Smith Barney; the JM Capital loan money came from Arrowhead. In fact, at trial Martin Hoffinger was not aware of JM Capital having a checking account at all.[16]

Including Bunch, seven product liability claims exist. Arrowhead funded the $500,000 allocated to Bunch's claim pre-petition. Bunch did not receive any of the money; the debtor did. There is no risk shifting element to the Arrowhead policy. The policy does not inure to the benefit of the injured third parties; instead, it merely reimburses the debtor for actual fees, expenses, and any resulting settlement or judgment subject to the deductible and occurrence annual limits. The Arrowhead policy is a claims made policy (Defs.' Ex. 66) meaning it only covers claims made while the policy is in place;[17] if the policy is cancelled, the debtor probably would have to purchase tail coverage. Arrowhead has no other customers. Accordingly, no collective premium pool has been created for the benefit of participating members. As previously stated, the debtor has never compared premiums paid to benefits received. Succinctly, this is similar to self-insurance at rates sufficient to cover any insurance obligations Arrowhead might have to the debtor and, with its incredible profit margin, fund credit back to the debtor to effectuate both equity distributions and interest on equity to the benefit of the debtor's stockholders.

■ To be an administrative expense, the expense must be actual and "neces-

---

16. JM Capital did open an account in May 2001, well after the initial 1999 loan transaction. (Defs.' Ex. 17.)

17. Ron Hanstein for Arrowhead testified that, under the Arrowhead policy, the occurrence and claim must occur during the coverage period.

sary." The Court awards Arrowhead an administrative claim expense for premiums accrued from September 1, 2001, to August 31, 2003, equal to an annual premium of $1,280,000, not the $1,560,000 claimed by Arrowhead. However, a prorated deduction must be made for the 12 day pre-petition period. From September 1, 2003, to the date of this opinion, the Court awards Arrowhead an administrative claim expense based on an annual premium of $1,280,000. This is without prejudice to Arrowhead's right to make future applications for administrative priority consistent with this opinion. The issues relating to an approximate $811,000 payment to Arrowhead shortly before the debtor filed its petition are reserved. Consistent with the parties' representations in court, the $811,000 amount shall be withheld from the above administrative payment amount and held in trust by the debtor pending further orders of the Court.

To the extent that Arrowhead's claim for product liability insurance premiums exceeds the amount awarded an administrative priority herein, that amount remains a general unsecured claim. These excess amounts, of course, have not been used to pay interest on equity, or as otherwise set forth in this opinion, and are not amenable to subordination or recharacterization.

Several factors compel this result; principally, a failure of proof. It is clear that the premiums to Arrowhead have been excessive over the years. In his correspondence and memos, Martin Hoffinger acknowledges that the premiums are well in excess of the commensurate amount necessary to reimburse the debtor under the Policy (or even any reasonable expectation that Arrowhead might have had). Well past its goal of providing insurance to the debtor and assurance to the banks and retailers, the Arrowhead premiums became a funding source to the debtor. This

funding source was ultimately used through JM Capital as outlined above.

Inexplicably, post-petition the debtor and Arrowhead effectuated a premium reduction from $1,560,000 to $1,280,000 with twice the per occurrence coverage—$500,000 to $1,000,000. Accordingly, unquestionably the new premium should be sufficient to provide half the coverage. However, no evidence was introduced to demonstrate how the old and new premiums were calculated or the appropriate allocation of current versus tail coverage. Accordingly, the Court will use the premium figure the debtor and Arrowhead adopted for the enhanced coverage. Surely that should suffice for the lesser prior coverage. The Court is not satisfied with this result, it simply does not have any evidence before it to find otherwise. It is evident that the debtor obligated itself to stay with Arrowhead as long as the JM Capital debt was still outstanding. This self-inflicted chilling effect calls into doubt its supposed efforts to find other coverage. Michael Monchick questioned the payments; a lesser amount is more consistent with the figures he discussed with Jennifer Dunn and the one other binder introduced at trial. The tail liability coverage, to which the debtor's expert attaches such significance, simply has not materialized. It strains credibility that the debtor would have such significant concerns about accidents that might have occurred between 1987 and 1994. History has simply mooted that concern. However, the evidence is lacking to otherwise adjust this premium figure.

CONCLUSION

JM Capital's claim is disallowed as a secured claim and recharacterized or reclassified as equity. Any liens or security interests it may claim are set aside. To the extent that it has any claim, secured or

unsecured, that claim is subordinated to the claims of all other creditors.

Arrowhead's stop loss insurance premiums that accrued post-petition are approved as an administrative expense. Arrowhead is awarded an administrative expense according to the formula outlined above; any excess expense remains a general unsecured claim. Any issues regarding the approximate $811,000 pre-petition payment to Arrowhead are reserved.

IT IS SO ORDERED.