**IN RE: DAYTON TITLE AGENCY, INC., Debtor**

**White Family Companies, Inc., Plaintiff**

v.

**PNC Bank, Defendant**

Case No. 99–35768
Adv. No. 14–3093

United States Bankruptcy Court, S.D. Ohio, Western Division.

Signed February 5, 2015

Entered February 6, 2015

not presently before this court.

Paul H. Shaneyfelt, Troy, OH, for Plaintiff.

Marcel C. Duhamel, Cleveland, OH, Lauren N. Fromme, Vorys, Sater, Seymour and Pease LLP, Columbus, OH, for Defendant.

## Decision Granting Defendant's Motion to Dismiss Complaint

Guy R. Humphrey, United States Bankruptcy Judge

### I. Introduction

The White Family Companies, Inc. ("WFC"), the holder of an allowed claim in this Chapter 7 case, filed a complaint seeking to equitably subordinate the claim of another creditor, PNC Bank ("PNC"),[1] to all other non-priority unsecured creditors pursuant to § 510(c) of the Bankruptcy Code. PNC has moved to dismiss the complaint on three grounds: lack of standing, preclusion principles and failure to state a claim upon which relief can be granted. Because WFC lacks standing to pursue this particular claim for equitable subordination and because its complaint fails to state a claim for equitable subordination, the court is concurrently entering an order dismissing the complaint.

### II. Procedural Background and Allegations of the Complaint

#### A. Procedural Background

This adversary proceeding was filed in the estate case of Dayton Title Agency, Inc. ("DTA"). The estate case was filed in 1999 and was administered as a Chapter 11 case until this court converted it to a Chapter 7 in 2008. (est.doc. 723). Ruth

---

1. PNC acquired National City Bank ("NCB"). NCB was the bank when the events occurred which led to DTA's bankruptcy petition and form the basis for this complaint. For simplicity, except for direct quotes from the complaint, the court will refer to PNC throughout this decision.

Slone is the Chapter 7 Trustee for the converted case (the "Trustee").

The history of the estate case and an adversary proceeding pursued in the estate case, captioned *Dayton Title Agency, Inc. v. The White Family Companies, Inc.*, Adv. No. 99–3664 (the "fraudulent conveyance adversary proceeding"), is well-described in the following decisions incorporated by reference: *The White Family Companies, Inc. v. Slone (In re Dayton Title Agency, Inc.)*, 724 F.3d 675 (6th Cir.2013); *The White Family Companies, Inc. v. Slone*, 468 B.R. 268 (S.D.Ohio 2012) and *In re Dayton Title Agency, Inc.*, 292 B.R. 857 (Bankr.S.D.Ohio 2003). The facts underlying the fraudulent conveyance adversary proceeding are central to this adversary proceeding. The fraudulent conveyance adversary proceeding was pending during most of the duration of the estate case and resulted in the estate's recovery of a judgment in the amount of $2,762,814.97 against WFC and against Nelson Wenrick for $1,379,336.41, plus an additional amount of $20,747.13 against WFC and Nelson Wenrick jointly. The separate awards against WFC and Wenrick were appealed. Those awards were originally reversed by the district court, but were later reinstated by the Sixth Circuit Court of Appeals. WFC and PNC were both parties to the fraudulent conveyance adversary proceeding. WFC was an original defendant and PNC was later added as an intervening plaintiff.

WFC initially pursued equitable subordination of PNC's claim through a motion, which the court denied without prejudice on procedural grounds, finding that Federal Rule of Bankruptcy Procedure 7001(8) requires that such relief be pursued through an adversary proceeding. WFC now pursues its equitable subordination claim through its complaint which initiated this adversary proceeding. (doc. 1). The allegations of WFC's complaint are summarized below.

**B. Factual Background**

PNC has a non-priority unsecured claim in the amount of $4,142,151.38. *See* Proof of Claim 48 (the "Proof of Claim").[2] This claim arises out of PNC providing a provisional credit to DTA on a fictitious check which was the subject of the fraudulent conveyance adversary proceeding. Part of these funds were paid to WFC through DTA's IOTA account and recovered by the Trustee through the fraudulent conveyance adversary proceeding. WFC has a non-priority unsecured claim in the amount of $2,762,815. *See* Proof of Claim 75. This claim arises out of the Trustee's recovery of the funds paid to WFC from the provisional credit provided to DTA by PNC.

On September 3, 1999 Invesco, LTD ("Invesco") delivered to WFC a promissory note, which was personally guaranteed by Michael S. Karaman. On October 20, 2009 WFC received payment from a check on DTA's "IOTA account."[3] WFC presented the check and exchanged the check for an official check drawn on and endorsed by PNC. PNC honored the official check and paid WFC $3,260,000. Howev-

---

2. PNC also filed two other unsecured claims evidenced by proofs of claim 46 and 47 in the amounts of $564,569.57 and $98,550.24, respectively, which have been resolved through agreed orders and are not at issue in this adversary proceeding.

3. IOTA is an acronym for "Interest on Trust Accounts." In 1995 the Ohio General Assembly established the IOTA program, which requires Ohio title insurance agencies to maintain such accounts, with the interest earned on these accounts being forwarded to the state to help subsidize the state's legal aid fund. See Ohio Revised Code § 3953–231.

er, the basis for honoring the check was a $5,000,000 check presented to DTA by Krishan Chari drawn on a fictitious bank account. PNC credited DTA's IOTA account with a "provisional credit" in the amount of $5,000,000. The result was DTA's account was overdrawn. DTA filed bankruptcy when PNC seized the funds in DTA's accounts.

The essence of PNC's and WFC's claims in this proceeding can be winnowed down to the following: PNC has a claim against DTA because it provisionally loaned DTA money on a check written from a fictitious account, with the basis of that claim being described on the proof of claim as a "Checking account overdraft" and WFC has a claim against DTA because it was initially paid the money that was provisionally loaned by PNC. WFC had to return those funds to DTA after the Sixth Circuit Court of Appeals affirmed the bankruptcy court's judgment against WFC in the fraudulent conveyance adversary proceeding. Underlying all of this is the fact that the only function which DTA played in these transactions was to serve as the entity which negotiated the fictitious check and issued two checks of its own based upon that fictitious check—one to WFC and one to Nelson Wenrick. Thus, DTA in effect served as the middleman for repayment of a loan owed by an outside party to another outside party, with the claims of both PNC and WFC arising because of the use of DTA and its IOTA account in this role.

The complaint alleges "NCB broke its rules relating to the DTA's IOTA account and its own policies regarding 'large dollar holds' when it allowed the checks from DTA's IOTA Account to be paid to WFC and Wenrick from the provisional credit and before the underlying funds were available." Complaint, ¶ 17. The complaint also refers to PNC's failure to follow

"its own rules and regulations" in transactions related to the IOTA account that go back to November 1998. Complaint, ¶ 19. For example, WFC asserts that "[b]etween November 1998 and 1999, DTA disbursed more than $8,000,000 from its IOTA Account in Chari related transactions before receiving any of the actual funds for the disbursements, and many of the unsupported disbursements bore no relation to the real estate transactions." Complaint, ¶ 20. In addition, the complaint alleges that "[i]n September, 1999, DTA made five disbursements from its IOTA account to Chari, or on his behalf while only one ($68,000 for the purchase of a medical building) was related to real estate financing." Complaint, ¶ 21. The complaint further alleges that PNC allowed "other disbursements" to be made from DTA's accounts to Chari or on Chari's behalf "which amounted to personal loans of trust fund beneficiaries' funds . . . ." Complaint, ¶ 22.

The complaint further asserts that personnel at PNC had knowledge of Chari's improper use of DTA's IOTA account. Specifically, the complaint alleges that:

> In January, 1999 PNC's Loss Prevention and Loss Avoidance and Investigation departments became aware of DTA's improper involvement with Chari after the return of a $2,950,000 Chari check against which disbursement from the IOTA Account had been made.
>
> Prior to this time, PNC had closed Chari's personal accounts for suspected check kiting.
>
> * * *
>
> Loss Prevention expressed serious concerns about Chari's activity through the IOTA on numerous occasions, but Loss Prevention's warnings were disregarded.

Complaint, ¶¶ 23, 24 & 27.

The complaint relies upon all of those assertions to aver that PNC "was complicit

in permitting or refusing to stop the lengthy fraud perpetrated by Chari ... through the use of DTA's IOTA Account ... [and that] [d]espite [its] knowledge of Chari's fraudulent actions and the multi-million[s] of dollars of overdrafts in DTA's IOTA Account resulting from Chari, ... did nothing to stop or impede the continuing fraudulent actions of Chari and DTA." Complaint, ¶¶ 31 and 32. The Complaint's ultimate conclusion is that "PNC's failure to stop ... Chari's check kiting and fraudulent transactions constitutes gross misconduct, and a finding that PNC was a participant in the perpetuation of Chari's fraud." Complaint, ¶ 33.

## III. Legal Analysis

### A. Jurisdiction and Standard of Review

■ No party has contested the jurisdiction of the court, nor its authority to enter a final judgment in this adversary proceeding. The court finds that it has jurisdiction pursuant to 28 U.S.C. § 1334, that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (O), and that it has the constitutional authority to enter final judgment in this adversary proceeding.

A motion to dismiss an adversary proceeding for "failure to state a claim upon which relief can be granted" is governed by Federal Rule of Civil Procedure 12(b)(6) (applicable by Bankruptcy Rule 7012(b)). The factual allegations must put the defendant on notice as to the claims being alleged and provide a sufficient factual predicate to make the allegations plausible, and not merely possible. *Ashcroft v. Iqbal*, 556 U.S. 662, 676–77, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Federal courts are not obligated to accept as true legal conclusions couched as factual allegations. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). While detailed factual allegations are not necessary, the allegations must be sufficiently detailed to create more than speculation of a cause of action. *Id.* A claim is plausible if the factual allegations are sufficient to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *HDC, LLC v. Ann Arbor*, 675 F.3d 608, 611 (6th Cir.2012) (citations and internal quotation marks omitted). *See* Fed. R. Civ. P. 8(a)(2), applicable by Fed. R. Bankr.P. 7008, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief [.]").

### B. *Preclusion Principles*: WFC's Claim for Equitable Subordination is Not Barred by Preclusion Principles

■ PNC asserts that WFC's adversary proceeding should be dismissed on the basis that WFC's pursuit of the equitable subordination claim is barred under res judicata principles. However, for the claim to be barred under those principles, it would have had to have existed at the time the fraudulent conveyance adversary proceeding was initiated and adjudicated.

PNC's preclusion argument is essentially as follows: 1) the bankruptcy estate sued WFC and Wenrick in the fraudulent conveyance adversary proceeding and PNC joined in that adversary proceeding as an additional plaintiff (See Adv. No. 99–3664; docs. 24, 27, 28, 30–32, 37 & 39); 2) WFC in fact filed counterclaims against PNC (See Adv. No. 99–3664; docs. 48 & 50); 3) many of the facts upon which the fraudulent conveyance adversary proceeding was premised also underlie this proceeding; and 4) WFC was legally obligated to file an additional counterclaim requesting PNC's claim in the bankruptcy case be equitably subordi-

nated to all the other creditors of Dayton Title.[4]

PNC's argument and logic regarding the preclusion prong of its motion fail because the claim for equitable subordination was not mature at the time that the fraudulent conveyance adversary proceeding was filed, the time at which PNC joined the adversary proceeding as an additional plaintiff, or at any other time during the adjudication of the adversary proceeding.

■ Whether PNC's argument is considered under the law governing compulsory counterclaims or under the principles of res judicata, the law within the Sixth Circuit requires that a party to an action join a claim as a counterclaim only if that claim is mature at the time that the party files its pleading. In this case, until the bankruptcy estate recovered the fraudulent conveyances from WFC and Wenrick, there were no funds to pay unsecured creditors like PNC. Because there were no funds to distribute to unsecured creditors, there was no reason to seek the subordination of PNC's claim to the claims of other creditors. Only if the bankruptcy estate and PNC were successful in obtaining a judgment against WFC and Wenrick in the fraudulent conveyance adversary proceeding and then successful in recovering any such judgment, was there a reason to seek the subordination of PNC's claim

or the claim of any other creditor. This court recognized that proposition when it granted the Trustee's motion and issued its order on February 21, 2014 (doc. 822) providing March 14, 2014 as the date by which proceedings seeking the equitable subordination of claims had to be filed.[5]

Federal Rule of Civil Procedure 13(a), applicable by Federal Rule of Bankruptcy Procedure 7013,[6] governs compulsory counterclaims and is designed to prevent multiple actions by requiring resolution of all disputes arising out of common matters in a single action. The rule is particularly aimed at prohibiting a party from pursuing a second action against a party when that party could have asserted that claim as a counterclaim in an earlier action. *Southern Constr. Co. v. Pickard,* 371 U.S. 57, 83 S.Ct. 108, 9 L.Ed.2d 31 (1962). *See also U.S. Gen., Inc. v. Joliet,* 598 F.2d 1050 (7th Cir.1979). Rule 13(a) requires that the claim actually be in existence at the time of the service of the pleading by the party who is alleged to have failed to assert a compulsory counterclaim, stating that: "A pleading must state as a counterclaim any claim that—*at the time of its service*—the *pleader has* against an opposing party. . . ." Fed. R. Civ. P. 13(a)(1) (emphasis added). *See Leatherworks P'ship v. Berk Realty,* 247 Fed.Appx. 676 (6th Cir.2007) (claim for fraud did not mature until the

---

**4.** As will be expanded upon in this section, in reality, this counterclaim would have been a contingent counterclaim, or one pled in the alternative, stating essentially that—in the event WFC and Wenrick lost the fraudulent conveyance adversary proceeding and the bankruptcy estate recovered a judgment against them, then PNC's claim should be subordinated to WFC's claim and all other unsecured claims.

**5.** .In addition, there is an issue as to whether WFC would have had standing to pursue a claim for equitable subordination prior to the time that it paid the fraudulently conveyed

funds to the bankruptcy estate. WFC did not hold an allowable claim against the bankruptcy estate until it paid the judgment against it. See 11 U.S.C. § 502(d) (providing for disallowance of a claim of an entity from which property is recoverable under, inter alia, 11 U.S.C. §§ 544 and 548, until such entity has paid the amount for which such entity is liable).

**6.** The bankruptcy-specific exception under Rule 7013 does not apply because the counterclaim does not seek a recovery against the debtor or the estate.

defrauded party became aware of the fraud, and claims maturing after service of the pleadings are not compulsory counterclaims.); *Young v. New Orleans*, 751 F.2d 794 (5th Cir.1985) (counterclaims under state law for malicious prosecution, libel, slander, intentional infliction of emotional distress, and abuse of process asserted by defendants, were based on actions of plaintiff subsequent to incident on which plaintiff's 42 U.S.C. § 1983 action was based, had not matured at time answer was filed and, therefore, were not compulsory counterclaims). The equitable subordination claim was not mature at the time that WFC filed its answer and counterclaims and, therefore, was not a compulsory counterclaim under Rule 13(a).[7]

However, PNC notes that the principles of res judicata are broader than Rule 13(a) and premises its argument on the doctrine of res judicata rather than Rule 13(a) governing compulsory counterclaims. *See TolTest, Inc. v. N. Am. Specialty Ins. Co.*, 362 Fed.Appx. 514,516 (6th Cir.2010) (prohibitions of res judicata are broader than Rule 13(a) preclusion); and *Sanders Con-*

*fectionery Prods., Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 484–85 (6th Cir.1992) ("[W]hat is important is not whether a particular claim is compulsory, but whether the claim should have been considered during the prior action."). Nevertheless, even under the doctrine of res judicata, a party need not pursue a claim against an opposing party if it is not mature at the time that its pleading is served. In addressing a res judicata issue arising out of a bankruptcy case, the Sixth Circuit stated:

> " '[A] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.' " *Cooley v. Granholm*, 291 F.3d 880, 883–84 (6th Cir.2002) (quoting *Texas v. United States*, 523 U.S. 296, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998)). As a rule, we do not allow litigation on premature claims to ensure that courts litigate "only existing, substantial controversies, not hypothetical questions or possibilities." *City Commc'ns, Inc. v. City of Detroit*, 888 F.2d 1081, 1089 (6th Cir.1989). Because

**7.** This situation is different than a claim for contribution or indemnity. *See Kane v. Magna Mixer Co.*, 71 F.3d 555 (6th Cir.1995) (failure to assert counterclaim for indemnity to third-party claim barred claimant from asserting that claim in a subsequent action on account of it having been a compulsory counterclaim). Under a claim for contribution or indemnity, the liability of the defendant or third-party defendant is being litigated in the original action and the apportionment of any liability or damages which is found flows from the same facts and determinations made in the original action. In this case, the court did not need to determine PNC's responsibility for the fraudulent conveyance made by DTA to WFC and Wenrick or PNC's responsibility otherwise for the demise of DTA. While there is a common set of facts to these two adversary proceedings, the court did not need to determine PNC's responsibility for the fraudulent conveyances as relates to DTA's creditors and its bankruptcy estate and the

making of any such determination would not have been appropriate unless and until the liability of WFC and Wenrick was first determined and recovery made from them. In addition, it is different from the res judicata effect which a confirmed plan of reorganization has on claims treated and resolved through a plan of reorganization or through an approved sale of assets under 11 U.S.C. § 363(f). *See Browning v. Levy*, 283 F.3d 761 (6th Cir.2002) and *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565 (6th Cir.2008). Because of the binding effect of a Chapter 11 plan as provided by 11 U.S.C. § 1141 (similarly 11 U.S.C. § 1327 as to Chapter 13 plans), the confirmed plan binds both the debtor and creditors relating to any claims which either has against the other. Similarly, the court's approval of a sale of assets under § 363(f) binds all parties to the transaction and transfers the assets free and clear of liens and encumbrances.

Winget's claims regard the valuation of collateral the Defendants have not yet sought, those claims are only hypothetical questions or possibilities, and the district court correctly dismissed those claims.

*Winget v. JP Morgan Chase Bank, N.A.,* 537 F.3d 565, 581–82 (6th Cir.2008) (finding some issues pertaining to the sale of assets in a bankruptcy to have been precluded under res judicata principles, but other issues related to the potential repossession of collateral not to have been precluded since the collateral had not been repossessed as of that time). That is the situation in this case—there was no need to pursue the subordination of PNC's claim unless or until the estate recovered on the claims against WFC and Wenrick. Until that time, the equitable subordination claim only presented a hypothetical question or possibility. Litigation of that claim prior to recovery on the claims against WFC and Wenrick would have been a purely academic exercise, potentially wasting unnecessary judicial resources.[8]

The equitable subordination claim being asserted by WFC in this proceeding was not mature at the time that WFC was served with the complaint in the fraudulent conveyance adversary proceeding. At the time that WFC and Wenrick were sued by the bankruptcy estate in the fraudulent conveyance adversary proceeding, WFC had been paid on its claim against Chari and the Chari entity which owed it the money and WFC did not have a claim against DTA and the bankruptcy estate. In fact, the earliest time that

WFC had a claim against DTA or the bankruptcy estate was in 2003 when the bankruptcy court entered judgment against WFC and Wenrick. However, WFC and Wenrick appealed that judgment and the judgment was reversed by the District Court in 2012. WFC did not pay the judgment to the DTA bankruptcy estate until January 17, 2014 (Adv. No. 99–3664; doc. 471), after the Sixth Circuit on July 31, 2013 reversed the district court and reinstated the judgment which the bankruptcy estate issued against WFC. Further, under §§ 502(d) and (h), WFC would not have had an allowable claim against DTA until January 17, 2014, and, therefore, would not likely have had standing to pursue the claim for equitable subordination until that time. For these reasons, any claim which WFC could have pursued for equitable subordination was not mature at the time that it filed and served its counterclaims against PNC in 1999 and, therefore, is not barred under res judicata, Rule 13(a) or other preclusion principles.

### C. *Standing*: WFC Lacks Standing to Pursue This Claim for Equitable Subordination

 PNC asserts that WFC lacks standing to request the court to equitably subordinate WFC's claim. Under these circumstances, the court agrees.

Section 510(c) provides, in relevant, part, that:

Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

---

8. This is consistent with the old legal adage that the law does not require one to do a vain and useless thing. *See McMicking v. Schields,* 238 U.S. 99, 103, 35 S.Ct. 665, 59 L.Ed. 1220 (1915); *Fine v. CSX Transp., Inc.,* 2000 WL 1206526, at *2, 2000 U.S.App. LEXIS 21529, at *6 (6th Cir. Aug. 18, 2000) and *Hettrick Mfg. Co. v. Waxahachie Cotton Mills,* 1 F.2d

913, 920 (6th Cir.1924). In this case, litigation of the equitable subordination claim would have been a vain and useless thing if recovery was not made from WFC and Wenrick as there would have been no funds to distribute to creditors and, therefore, no reason to subordinate PNC's claim to the claims of the other creditors.

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest[.]

11 U.S.C. § 510(c). The Bankruptcy Code and Bankruptcy Rules are silent as to who may prosecute a proceeding seeking to equitably subordinate a claim. Section 510(c) simply states that the court may equitably subordinate a claim "after notice and a hearing."

Significantly for purposes of standing, WFC is not asserting its own individual rights or injury, but rather an injury common to all of the creditors of DTA. While it is indirectly advocating its own interests as a member of the class of general unsecured creditors, it is not prosecuting this adversary proceeding in its individual creditor capacity. Rather, WFC's complaint alleges that "PNC's conduct, including but not limited to its failure [to follow]· its own internal rules and procedures was inequitable and resulted in harm to all other general unsecured creditors of DTA." Complaint, ¶ 35. The prayer for relief seeks "an Order equitably subordinating PNC's POC No. 48 to all other general unsecured creditors of DTA." Complaint, p. 7.

There seems little doubt that WFC would have standing to seek the subordination of PNC's claim to its own claim. Section 510(c) expressly allows subordination of a claim "to all or part of another allowed claim." The courts have permitted a single creditor to obtain subordination of a specific claim to its own claim when the requirements of equitable subordination have been met. *See In re Vitreous Steel Prods. Co.*, 911 F.2d 1223, 1231 (7th Cir.1990); *Bunch v. JM Capital Fin., Ltd. (In re Hoffinger Indus.)*, 327 B.R.

389, 394 (Bankr.E.D.Ark.2005); *ABF Capital Mgmt. v. Kidder Peabody & Co., Inc. (In re Granite Partners, L.P.)*, 210 B.R. 508, 514 (Bankr.S.D.N.Y.1997); and *Westcon Grp. N. Am., Inc. (In re Noblehouse Techs., Inc.)*, 2013 WL 6816129, at *4–5, 2013 Bankr.LEXIS 5397, at *13 (Bankr. N.D.N.Y. Dec. 24, 2013) (An individual creditor may assert a claim for equitable subordination against another creditor in Chapter 11 if the creditor suffered a particularized injury.). However, WFC seeks to have PNC's claim equitably subordinated to the non-priority unsecured creditor class. Further, it does so in a Chapter 7 bankruptcy case.

There are contexts in which courts have found parties other than a trustee to have standing to pursue equitable subordination claims within a Chapter 11 case. Thus, in *Variable–Parameter Fixture Dev't Corp. v. Comerica Bank–California (In re Morpheus Lights, Inc.)*, 228 B.R. 449, 454 (Bankr.N.D.Cal.1998) the court held that, when no trustee has been appointed, an equitable subordination claim should be brought by the debtor in possession or creditors committee. In *Algonquin Power Income Fund v. Ridgewood Heights, Inc. (In re Franklin Indus. Complex, Inc.)*, 2007 WL 2509709, 2007 Bankr.LEXIS 3004 (Bankr.N.D.N.Y. Aug. 30, 2007) the court found that an individual creditor could pursue an equitable subordination claim in a Chapter 11 case when the debtors had conflicts of interest relating to the claim and, thus, were not well-suited to pursue the claim. In *Official Comm. of Unsecured Creditors v. ASEA Brown Boverie, Inc.*, 313 B.R. 219, 228–29 (Bankr. N.D.Ohio 2004), the court found that a creditors committee had standing to pursue an equitable subordination claim. Further, in *Hoffinger Industries*, the court found that an individual creditor had standing to bring an equitable subordina-

tion claim when the debtor and lender were controlled by the same family. 327 B.R. at 412–14.

However, case law recognizes differences between a creditor's standing in a Chapter 7 and in a Chapter 11 to pursue equitable subordination under § 510(c). Whether an individual creditor or other party besides a trustee may pursue an equitable subordination claim in a Chapter 11 case raises issues not present within a Chapter 7 liquidation case. In a Chapter 11, "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b). This provision is a very broad grant of standing to parties in a Chapter 11 case. There is no comparable section addressing standing within a Chapter 7 case. In addition, while a debtor in possession in a Chapter 11 case is provided with the rights, powers, and duties of a trustee under Chapter 11, those are not the same as the duties assigned to a Chapter 7 trustee. *See* 11 U.S.C. §§ 704, 1106, and 1107. In a Chapter 11, a trustee is not usually appointed and the debtor in possession frequently has conflicting interests in pursuing claims against creditors. Thus, under such circumstances, a creditor may be in the best position to pursue an equitable subordination claim. *See Official Comm. Of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 560 (3rd Cir.2003); and *Panelized Tech., Inc. v. Tesoro Savings & Loan Ass'n. (In re Fargo Fin., Inc.)*, 80 B.R. 247 (Bankr. N.D.Ga.1987). *See also Algonquin Power Income Fund*, 2007 WL 2509709, 2007

Bankr.LEXIS 3004 and *Hoffinger Indus., Inc.*, 327 B.R. 389.[9]

In a Chapter 7 case, the trustee is independent and has no conflicting interests and has the duty to administer the estate for the benefit of all of the unsecured creditors. The Bankruptcy Code assigns specific duties to a Chapter 7 trustee, including the duties to:

(1) collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest;

(2) be accountable for all property received;

\* \* \*

(4) investigate the financial affairs of the debtor;

(5) if a purpose would be served, examine proofs of claims and object to the allowance of any claim that is improper;

\* \* \*

(7) unless the court orders otherwise, furnish such information concerning the estate and the estate's administration as is requested by a party in interest;

\* \* \*

(9) make a final report and file a final account of the administration of the estate with the court and with the United States trustee[.]

11 U.S.C. § 704(a). Therefore, in a Chapter 7 liquidation case, the trustee is assigned the task of reviewing claims and objecting to them. *See* Advisory Committee Note to Bankruptcy Rule 3007 (advising that the right to object to claims is

---

**9.** This case began with a Chapter 11 petition, but was converted to a Chapter 7 case in 2008. At the time this adversary proceeding was initiated, the Chapter 7 trustee was in place and had the ability to pursue such a claim, but apparently chose not to do so.

generally exercised by the trustee under the authority provided by § 704(a)).

An individual creditor does not have standing in a Chapter 7 case to pursue equitable subordination of a claim on behalf of all general unsecured creditors. The Chapter 7 trustee is the proper party to bring such claims. Unless the creditor can establish an injury that is particular to it, as opposed to being common to all unsecured creditors, such claims belong to the Chapter 7 trustee during the pendency of the Chapter 7 case. *Black Palm Dev't Corp. v. Barlage*, 2011 WL 4858420, at *4, 2011 U.S. Dist. Lexis 118734, at *10–11 (W.D.N.C. Oct. 13, 2011) (Chapter 7 trustee has standing to pursue equitable subordination claim and an individual creditor is required to have particularized injury to pursue a subordination claim.); *Elway Co., LLP v. Miller (In re Elrod Holdings Corp.)*, 392 B.R. 110, 115 (Bankr.D.Del. 2008) (creditor required to allege particularized injury to pursue an equitable subordination claim in Chapter 7); *Acme Eng'g Co. v. Bayside Enters., Inc. (In re Medomak Canning)*, 101 B.R. 399, 401 (Bankr.D.Me.1989); *The American Cigar Co. v. Phillip Morris Inc. (In re M. Paolella & Sons, Inc.)*, 85 B.R. 965, 973 (Bankr.E.D.Pa.1988); and *Societa Internazionale Turismo S.P.A. v. Barr (In re Lockwood)*, 14 B.R. 374, 381 (Bankr. E.D.N.Y.1981) ("The proper party to seek equitable subordination is the trustee.").[10]

This case exemplifies at least some of the reasons why the equitable subordination claim rightfully belongs to the Chapter 7 trustee. The case has a long history of opposing parties vigorously pursuing their rights and interests through contentious litigation. PNC and WFC have been long and ardent opponents in this case. Under such circumstances, the trustee should be the party determining when to pursue the equitable subordination of one unsecured creditor's claim to all of the general unsecured creditors. The trustee can independently weigh the merits of such litigation against the costs, delay, and burdens on the estate of pursuit of such

---

**10.** This law is consistent with the law in the Sixth Circuit and in other jurisdictions holding that only the Chapter 7 trustee has the authority to pursue fraudulent conveyance claims, alter ego claims, and other avoidance actions which are common to unsecured creditors unless and until the trustee abandons such claims. Only when an injury is particular to that creditor, can a creditor pursue such a claim while the bankruptcy is pending or prior to the abandonment of the claim by the trustee. *See NLRB v. Martin Arsham Sewing Co.*, 873 F.2d 884, 887 (6th Cir.1989) (citing *Amer. Nat'l Bank of Austin v. MortgageAmerica Corp. (In re Mortgage America Corp.*, 714 F.2d 1266, 1275 (5th Cir. 1983)). This principle has been applied a number of times within the Sixth Circuit. *See Hatchett v. United States*, 330 F.3d 875, 886 (6th Cir.2003) (trustee has exclusive right to bring an action for fraudulent conveyance during the pendency of the bankruptcy case); *Lincoln Elect. Co. v. Manahan*, 2011 WL 3516201, at *7, 2011 U.S. Dist. LEXIS 89169, at *20 (N.D.Ohio Aug. 11, 2011) (judgment creditor lacked standing to pursue claims under Ohio Uniform Fraudulent Transfer Act and for civil conspiracy against non-debtors who benefitted from alleged fraudulent transfers from a bankrupt debtor because injury was shared by bankruptcy estate and all creditors, with the claims belonging to the bankruptcy estate); *Famous Supply Co. of Canton v. Cent. Heating & Air Conditioning, Inc. (In re Cent. Heating & Air Conditioning, Inc.)*, 64 B.R. 733, 736–37 (N.D.Ohio 1986) ("collateral action against third parties by a creditor seeking to secure its obligation by attacking a fraudulent conveyance is stayed by § 362(a)" and citing MortgageAmerica); and *Rieser v. Hayslip (In re Canyon Sys. Corp.)*, 343 B.R. 615, 659 (Bankr.S.D.Ohio 2006) ("Allowing a bankruptcy trustee to pursue general creditor claims 'ensures that the estate will not be wholly or partially consumed for the benefit of one creditor, or even a small number of creditors.'") (quoting *Schimmelpenninck v. Byrne (In re Schimmelpenninck)*, 183 F.3d 347, 360 (5th Cir.1999)).

litigation.[11]

Accordingly, because WFC has not alleged any particularized injury arising out of PNC's conduct, but rather seeks to subordinate PNC's claim on behalf of all nonpriority unsecured creditors, and since this is a Chapter 7 case in which only the Trustee has the standing to pursue such a claim, the court finds that WFC lacks standing to pursue the equitable subordination claim.

**D. Failure to State a Claim: WFC's Allegations Against PNC Fail to Rise to the Level of Conduct Required for Equitable Subordination**

 Even if one were to assume that WFC has standing to pursue the equitable subordination claim, the court finds that WFC's complaint does not state a claim for which relief can be granted because the factual allegations do not rise to the level of misconduct required to support equitable subordination of PNC's claim.

 The remedy of equitable subordination "is an unusual remedy which should be applied in limited circumstances." *Bayer Corp. v. Mascotech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 745 (6th Cir.2001) (citations omitted). In its *Baker & Getty* decision, the Sixth Circuit adopted the *Mobile Steel* test for determining whether a court should equitably subordinate a claim:

1. The claimant must have engaged in some type of inequitable conduct.

2. The misconduct must have resulted in injury to the creditors of the bankrupt

or conferred an unfair advantage on the claimant.

3. Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Servs.)*, 974 F.2d 712, 718 (6th Cir.1992) (internal citations omitted). *See also Autostyle Plastics*, 269 F.3d at 744–45.

 The legal standard applied to the three-part *Mobile Steel* test is different for an insider and a non-insider:

The primary distinctions between subordinating the claims of insiders versus those of non-insiders lie in the severity of the misconduct required to be shown, and the degree to which the court will scrutinize the claimant's actions toward the debtor or its creditors. Where the claimant is a non-insider, egregious conduct must be proven with particularity. It is insufficient for the objectant in such cases merely to establish sharp dealing; rather, he must prove that the claimant is guilty of gross misconduct tantamount to fraud, overreaching or spoliation to the detriment of others. Where the claimant is an insider, his dealings with the debtor will be subjected to more exacting scrutiny.

*Baker & Getty*, 974 F.2d at 718. There is no allegation that PNC was an insider of DTA and, accordingly, for equitable subordination to be warranted, its misconduct must have been egregious or so gross as to be equivalent to "fraud, overreaching or spoliation to the detriment of others." *Id.* (quoting *Anaconda–Ericsson, Inc. v. Hes-*

---

**11.** Another aspect of such litigation pursued for the benefit of all unsecured creditors is the potential pursuit of an administrative expense claim by the party prosecuting the claim. *See* 11 U.S.C. § 503(b). WFC has not indicated it would pursue such a claim and it would face a difficult road in doing so. *See Algonquin*

*Power Income Fund v. Ridgewood Heights, Inc. (In re Franklin Indus. Complex, Inc.)*, 2007 WL 2509709, at * *11–12, 2007 Bankr.LEXIS 3004, at * *35–38 (Bankr. N.D.N.Y. Aug. 30, 2007) for a discussion of this issue.

sen (In re Teltronics Serv., Inc.), 29 B.R. 139, 169 (Bankr.E.D.N.Y.1983)). The court finds that the complaint does not allege such conduct.

As noted, the complaint avers that PNC violated its own rules and regulations relating to customer transactions and knowingly allowed funds to flow through the Dayton Title IOTA account to be used for improper purposes, namely Chari transactions which were not related to real estate transactions which Dayton Title was closing or for which it was providing title insurance. Thus, the allegations are that PNC knowingly permitted Chari to use the Dayton Title IOTA account for improper purposes in contravention of its own rules and regulations and proper banking standards.

Viewing the allegations in a light most favorable to WFC, the complaint, at best, asserts instances of negligence or lack of care by PNC, not the egregious conduct required to equitably subordinate claims in bankruptcy. The facts and principles underlying the *Baker & Getty* decision are instructive on this point. WFC's allegations of PNC's misconduct are no more egregious than the facts which the Sixth Circuit found in *Baker & Getty* insufficient to equitably subordinate a bank's claim. The trustee in *Baker & Getty* established

that the bank lent money to the primary obligors, with the secondary guarantor only being an "after thought"; the guarantor's assets had no bearing on the bank's decision to lend money to the primary obligors; the bank failed to perfect its liens on the primary obligors' assets, which would have provided the bank with sufficient security to recover its losses; the bank committed wrongdoing in taking money from the wrong accounts and having executed against property not· owned by any party to the loan; and the bank settled with the primary obligors for less than 25% owed on the loan. In reversing the bankruptcy court's subordination of the bank's claim, the district court noted that the bank's practices with respect to the loan were "lax, imprudent, and ill-advised," but the conduct was not gross or egregious as related to the bankruptcy estate. *Id.* In affirming the district court, the Sixth Circuit emphasized that the bank's conduct was not "specifically directed toward the injury of the debtor or other creditors or for gaining an unfair advantage over other creditors." *Id.* at 719.[12]

There is no allegation that PNC's conduct was "specifically directed toward the injury of the debtor or other creditors or for gaining an unfair advantage over other

---

**12.** Other courts have also refused to equitably subordinate bank claims under similar facts. In *Grede v. Bank of N.Y. Mellon*, 441 B.R. 864 (N.D.Ill.2010), the court held that a trustee was not entitled to equitable subordination when (1) the lenders had no legal obligation to seek out or analyze data which the trustee claimed would have led them to proper conclusions; (2) the lenders may have been negligent, but the transactions were conducted at arm's length and in good faith; and (3) even assuming the lenders were prohibited from asserting lien rights over assets deposited in special purpose accounts, the lenders did not violate that prohibition because it at no time did they place a lien on assets in the segregated accounts. In *Desmond v. ASR Acquisition*

*Corp. (In·re Desmond)*, 334 B.R. 78 (Bankr: D.N.H.2005), the debtor's claim of equitable subordination against a lender was dismissed because the debtor did not plead with particularity or specificity under Federal Rule of Civil Procedure 9(b) facts which would have established that the lender was a fiduciary of the debtor or that the lender committed any type of fraud. *See also In re Sentinel Mgmt. Group, Inc.*, 728 F.3d 660, 669 (7th Cir.2013) (Misconduct justifying equitable subordination typically "(1) fraud, illegality, breach of fiduciary duties; (2) under-capitalization; [or] (3) claimant's use of the debtor as a mere instrumentality or alter ego.") (citations omitted).

creditors." *Id.* Just as the district court concluded in *Baker & Getty*, the court could conclude under the facts alleged by WFC that PNC's business practices leading to the damage inflicted upon DTA and its creditors were "lax, imprudent, and ill-advised." *Id.* However, PNC's conduct placed it in the same position as other unsecured creditors and therefore could not have been taken for the purpose of inflicting injury on DTA or other creditors or for gaining an unfair advantage over other creditors. The conduct of PNC's employees simply reflected bad business practices, not the egregious conduct required to equitably subordinate claims in bankruptcy.[13]

Thus, even if WFC had standing to pursue an equitable subordination claim, its complaint must nevertheless be dismissed because the allegations of PNC's conduct are not so egregious as to rise to the level of gross misconduct sufficient to equitably subordinate a claim under *Baker & Getty* and the *Mobile Steel* standard.

## IV. Conclusion

For the reasons stated in this Decision, WFC's complaint seeking to equitably subordinate the claim of PNC (Proof of Claim No. 48) shall be dismissed. The court is contemporaneously entering an order consistent with this decision.

**IT IS SO ORDERED.**

---

**13.** WFC mentions that Judge Merritt noted in his concurring opinion in *Slone v. White Family Companies*, that "[i]f any party besides Chari is to blame, one might blame the bank, which could have prevented this mess by refusing to extend to Dayton Title the provisional credit and by waiting for Chari's check to clear." *White Family Cos., Inc. v. Slone (In re Dayton Title Agency, Inc.)*, 724 F.3d 675, 686 (6th Cir.2013). However, while perhaps assigning blame for what happened, this statement does not address the nature or degree of PNC's conduct. That is the issue here—the nature and degree of PNC's misconduct.